In The Matter of The Petition for Review of The Probate of the Last Will and Testament of Ellwood Frank Sharpley, deceased.

1. Evidence—Nonexperts May Give Opinion of Testamentary Capacity on Subsequent Observations.

   Opinions of nonexperts as to testator's testamentary capacity are not inadmissible, because based on their observations a day or more after he made his will.

2. EVIDENCE—VALUE OF NONEXPERT OPINION AS TO MENTAL CAPACITY MUST BE BASED ON, AND VALUE DEPENDS ON, FACTS OBSERVED AND STATED.

Opinions of nonexperts as to testator's testamentary capacity must be based on his conduct, words, and appearance, observed and stated by them, so their value depends on the extent and importance of such facts.

3. WILLS—NO PRESUMPTION OF DELIRIUM AT SIGNING BECAUSE OF DELIRIUM IN LATER STAGE OF PNEUMONIA.

There is no presumption that testator was delirious when he made his will, the second day he was sick with pneumonia, a progressive disease, because he was delirious some time the next day.

4. WITNESSES—BENEFICIARY COMPETENT AS TO TESTATOR'S KNOWLEDGE.

One is a competent witness to testator's knowledge of the contents of the will, notwithstanding he drew it, was named executor and trustee, and members of his immediate family were principal beneficiaries, though such cirsumstances call for stricter scrutiny and proof.

5. WILLS—TESTATOR'S KNOWLEDGE SHOWN BY EVIDENCE OF DRAWING ACCORDING TO INSTRUCTIONS.

Testator's knowledge of the contents of the will may be proved by undisputed testimony that it was in strict conformity to his instructions given the scrivener a few hours before its signing, as well as by showing that it was read to him.

6. WILLS—TESTAMENTARY CAPACITY SHOWN.

Evidence on proceeding for review of probate *held* to show testamentary capacity of testator.

7. WILLS—IN CLEAR CASE ON APPEAL FROM REGISTER, NO DIRECTION OF ISSUE TO JURY.

The court, on appeal from register of wills in probate proceedings, being clearly of opinion from the testimony that testator was of sound mind, will not direct issue to be tried by the jury for its assistance and information.

(*January* 31, 1923.)

PENNEWILL, C. J., and HARRINGTON, J., sitting.

*Robert G. Harman* for appellants.

*William S. Hilles, David J. Reinhardt* and *Frank L. Speakman* for appellees.

Superior Court for New Castle County, January Term, 1923.

Appeal from the register of wills, No. 57, November term, 1922.

The will of Ellwood F. Sharpley was admitted to probate by the register of wills for New Castle county, May 13, 1920. On June 25, 1921, a petition for review of the probate was filed by Howard B. Springer, Elwell L. Springer, Rebecca J. Bird, and Mary J. Jones, cousins of the testator.

The will was executed on Sunday afternoon or early evening of April 25, 1920, in the testator's room, in the presence of Daniel T. Stubbs and John G. Weller, the testamentary witnesses, and William T. Lynam, who wrote the will. The date of execution stated in the will, April 24th, was a mistake of the draftsman.

The testator was about 67 years of age, never married, and had no home other than his room in the boarding house where he lived. He had been free, practically all his life, from serious disease or sickness until he contracted pneumonia, the illness from which he was suffering when he made his will, and from which he died eight days thereafter. He had been for many years receiving teller in a bank, and it is not denied that up to April 21, 1920, four days before making his will, he had never had any mental affliction or impairment. It is uncontroverted that up to that time he was of sound mind, memory and understanding. He had been suffering from a very bad cold and cough for some time, which according to Dr. Carmichael, the attending physician, developed into lobar pneumonia on Saturday, April 24th, the day before the will was signed. His lungs had then begun to fill up. The testator was physically a weak and sick man when he made his will, and was removed to a hospital in an ambulance the next morning about 10 o'clock. His nearest relatives were cousins.

The testator, at the time of his death, was the owner of a valuable farm in Brandywine hundred. His estate amounted to at least $60,000, which by his will he disposed of as follows:

"Item. I give and bequeath unto my executor hereinafter named, the sum of fifteen thousand dollars ($15,000), in trust to invest the same with full power to change such investments at such times, and in such manner as he may deem best, and to collect the income arising therefrom, and pay over the said income, in quarterly payments, or oftener in the discretion of said trustee, to my cousin Rebecca J. Bird, for and during the term of her natural life; at and immediately upon the decease of said Rebecca J. Bird, the said principal sum of fifteen thousand dollars, and all unexpended income arising therefrom, shall pass into and form a part of my residuary estate, and be disposed of as directed by the residuary clause of this my will.

"Item.   I give and bequeath unto Old Swedes Holy Trinity Episcopal Church, situate on East Seventh street, in the city of Wilmington, Delaware, the sum of three thousand dollars.

"Item.   I give and bequeath unto the cemetery association, connected with said Old Swedes Holy Trinity Episcopal Church, the sum of three thousand dollars to be used in replacing and repairing and keeping in repair the monument in the Sharpley burial lot in said cemetery.

"Item.   I give and bequeath unto the children of my cousin Ira L. Sharpley, who were living at the time of his death, to each the sum of one thousand dollars.

"Item.   I give and bequeath to Howard S. Springer, the sum of five hundred dollars; to Frank S. Springer, son of Elwell L. Springer, the sum of one thousand dollars; to Annie B. Yeates; wife of Herbert Yeates, the sum of one thousand dollars; to Miss Alice M. Smith, and Miss Martha E. Sayers, to each, the sum of one hundred dollars.

"Item.   I give and bequeath unto Eva Lynam, wife of William T. Lynam, my old eight-day clock, and such part of my blankets and other bedding material as she may select.

"Item.   All the rest, residue and remainder of my estate, of whatsoever kind, and wheresoever situate, including the sum of fifteen thousand dollars, held for the benefit of my cousin Rebecca J. Bird, for her life, I order and direct shall be divided into six equal parts, and disposed of as follows:  I give, devise and bequeath two of said parts unto Herbert Yeates, to have and to hold the same to him and his heirs and assigns forever, I give, devise and bequeath two other of said parts unto Rodney S. Lynam, to him and his heirs and assigns forever.   I give, devise and bequeath unto Mildred M. Lynam daughter of William T. Lynam, one other of said parts, to her and her heirs and assigns forever.   And the remaining one of said parts, I give, devise and bequeath unto William T. Lynam, Jr., to him and his heirs and assigns forever.

"Item.  I hereby constitute and appoint my friend, William T. Lynam, executor of this my last will, without bond, except as required by law, and I do also constitute and appoint him, the said William T. Lynam, sole trustee for such portions of my estate as are given in trust.   I do hereby authorize and empower my said executor to sell, either at public or private sale, at any time after my decease, and to execute and deliver to the respective purchasers, deeds for the same, the said purchasers taking title to said real estate free of any and all responsibility as to the application, misapplication or nonapplication, of the purchase money, or any part thereof, and freed and discharged of any and all trusts.   *       *       *       *       ".

PENNEWILL, C. J., delivering the opinion of the court:

The ground set out in the petition for review of the probate is as follows:

"That your petitioners aver that the said Ellwood Frank Sharpley, at the time said paper writing alleged to be his last will and testament was made, was not of sound and disposing mind and memory and was mentally incapable

of making a will, and that said alleged will thus admitted to probate is not his last will and testament, and that the said Ellwood F. Sharpley died intestate and without making any will whatsoever."

The petitioners do not claim in their petition that there was any undue influence exerted over the testator, but base their attack upon the single ground of mental incapacity.

The petitioners did request the register of wills, as they do this court, to send an issue to a jury to determine whether said paper writing was or was not the will of Ellwood F. Sharpley. It is conceded, however, by counsel for the petitioners that the heir at law is not entitled to a jury trial, as a matter of right, under the law of this state, and that the sending of such an issue is entirely within the discretion of the court, and solely for the purpose of enlightening its conscience.

There is considerable testimony in relation to the friendly and intimate relations that existed between Mr. Sharpley and his cousins, Howard Springer, Mrs. Bird and Etta Sharpley, especially Howard Springer, and also between Mr. Sharpley and the Lynam family, particularly William T. Lynam, who were not related to him. But this evidence is not very important because it has but little bearing upon the testamentary capacity of the testator at the time he made his will.

The testimony in the case is very voluminous, and a clear and fair summary of it could not be made without unduly extending the opinion. The references made to the testimony, in the course of the opinion, will, we think, sufficiently present the material facts.

The law respecting testamentary capacity is so well settled in this state it is hardly necessary to quote from decided cases. The following principles, which are not disputed, and which are particularly applicable to the facts of the present case, may be stated:

"If ＊ ＊ ＊ the testator was capable of exercising thought and judgment and reflection; if he knew what he was about, and had memory and judgment—his will could not be invalidated." *Chandler v. Ferris*, 1 *Harr.* 464.

"The question is, not how well a man can talk or reason, or how much judgment he can display, or with how great propriety and sense he can act. It is only, has he mind and reason? Can he talk rationally and sensibly, or

has he thought, judgment and reflection?  Weakness of mind may exist in many degrees without making a man intestable." *Duffield v. Morris' Executor,* *2 Harr.* 375-379.

"Intellectual feebleness alone, or mere weakness of the understanding, whether this condition of the mind be natural, or the result of an injury, or of disease, does not disqualify a person from making a valid will.

"A partial failure of mind or memory, that is to say, even a failure of mind or memory, to a considerable extent, whether it arise from an attack of apoplexy or paralysis, or from any other cause, is not, in itself, sufficient ground for setting aside a will, if there remains sufficient mind and memory to enable the testator to comprehend and understand what he is about or what he is doing.    *    *    *

"In considering and determining the question of capacity, the time when the will was executed is the material point to which the jury must look to ascertain the state and condition of the testator's mind.  For, although he may have been incapable at any time before, or after that period, yet, if he had sufficient capacity at the time when the will was executed, his prior or subsequent incapacity, amounts to nothing and the will must stand." *Jamison Case, 3 Houst.* 122.

In considering the testimony in this case, and the application of the law thereto, there are some facts, unusual in will cases, that are significant.

1.  As already stated, the testator up to four days before he made his will, had been entirely normal mentally and physically. There had never been even a suspision of unsoundness of mind, and the only serious sickness he ever had was from typhoid fever about five years before his death.  With that exception the only physical trouble was a persistent cold and cough for a week or two before he developed pneumonia.

2.  At no time before, or during his last illness, was he afflicted with fixed and continuing insanity.  The only mental disorder observed during his sickness was delirium or flightiness, at times, caused by fever that was incident to his disease.  There can be no presumption, therefore, of testamentary incapacity because of fixed and continuing insanity.

3.  No witness who testified against the will saw the testator on the day he made his will, and no one, except Howard B. Springer, saw him shortly before.  Howard B. Springer testified that his cousin was in a bad condition mentally and physically on Wednesday, April 21st, and incapable at that time of making a

will. But opposed to this testimony are these undisputed facts: Mr. Sharpley was at the bank on Wednesday morning, and in the evening went to the home of William T. Lynam and took dinner with the family, in accordance with his usual habit, and returned to his home about 9 o'clock.

There is no testimony, other than that of Howard B. Springer, which tends to show that the testator did not possess testamentary capacity at any time before Sunday, April 25th, the day the will was signed. There is much to show he had such capacity.

4. There is no direct evidence which shows that the testator did not possess testamentary capacity on the day he made his will, unless the uncertain and contradictory testimony of the subscrib ing witnesses may be given that effect. It is a remarkable and most unusual fact that these witnesses should say they were unable to form an opinion respecting the mental condition of the testator, when they had testified before the register of wills more than a year before, when the will was offered for probate and the circumstances attending its execution were presumably fresh in their minds, that he was of sound and disposing mind and memory. Mr. Stubbs did testify, in this case, that he signed as a witness at Mr. Sharpley's request, and that it was at Mr. Sharpley's request that he asked Mr. Weller to do so. According to this testimony Mr. Sharpley did know at the time that he was making his will.

If we disregard the testimony of the testamentary witnesses in so far as it relates to the mental condition of the testator at the time he made his will, and the testimony of Howard B. Springer as to his mental condition before, there is nothing to show that the testator lacked testamentary capacity at the time he made his will, unless the testimony of other witnesses, who observed Mr. Sharpley's condition on the day after the will was made and on later days, must be given what may be called retroactive effect.

[1, 2] 5. The ambulance operators and the nurses at the hospital, and other nonexpert witnesses who saw the condition of the testator on the day after he made his will, or on later days, testified that from what they observed they were of the opinon he did not have testamentary capacity *at the time* he made his will.

It was strongly argued for the propounders of the will that such testimony was not admissible, and the following authority was cited in support of the proposition: *Wharton-Stille, Med. Juris. vol. 1, §360 (5th Ed.)*, in which it is said:

"And the opinion of a witness as to the sanity of a party must relate to the time of his examination or observation of his conduct and appearance; and he cannot be required to give his opinion as to capacity previous to that time. Nor can nonexpert witnesses give their opinions as to the mental condition of a person on a particular day, when they did not see him at that time."

See, also, *McBride v. McBride*, 142 *Iowa* 174, 120 *N. W.* 709; *Blake v. Rourke*, 74 *Iowa* 519, 38 *N. W.* 392.

While there is a great deal of force and sound reason in the proposition, we are not inclined to lay it down as the law of this state, because we know that this court has permitted such opinions to be given in contested will cases.

But it is undoubtedly the law of this and other states that the opinion of a nonprofessional or nonexpert witness must be based on the conduct, words and appearance of the testator, or other facts observed by the witness, and the correctness and value of the opinion expressed will depend on the facts stated. If the facts are meager and unimportant, the opinion is correspondingly weakened, and may be of no value at all. *Jamison v. Jamison*, 3 *Houst.* 121.

This law is, we think, applicable to the opinions given by most of the witnesses against the will, who did not see the testator until he was taken to the hospital, and who expressed the opinion that, from what they saw of him there, he was without testamentary capacity the day before he came. Most of them saw him for a very brief time. One of the nurses was in his presence but a few seconds, and did not hear him say anything, but she nevertheless expressed an opinion as to his mental condition the day before. One or two other nurses saw the patient but a short time, at infrequent intervals, and none of them talked with him; they said he could not talk, or did not understand. Some of them said he was delirious at times, and one said he was delirious all the time. All of them testified that he was very deaf, very sick and very

weak. No doubt he was delirious at times, when the fever was high, and especially during the last few days of his illness.

The court are inclined to believe that the facts upon which these witnesses based their opinions that the testator was without testamentary capacity at the time he made his will, except possibly the day nurse and the night nurse who were on duty Monday and Tuesday, are based on very meager facts, and are, therefore, to be given but little weight. The day nurse and the night nurse had much better opportunities to observe the patient's condition, but they probably mistook physical weakness for mental infirmity. They were impressed with the patient's apparent inability to talk or understand. It does not appear that he made irrational remarks, except at times in answering a question incorrectly.

It must be remembered that Mr. Sharpley, when at the hospital, was not only sick and weak physically; he was also very deaf. It is not surprising that he did not talk much during that time. Very likely he did not hear when spoken to, and very likely he did not want to talk except to certain persons, viz., the doctor who was attending him and the lawyer who wrote his will. The testimony is clear and uncontroverted that he did talk to them, to the one on Sunday and to the other up to a short time before his death. Miss Davis, the special nurse, testified that he was always rational whenever the doctor came. There is testimony given by a witness, whose truthfulness and judgment no one has questioned, that is significant. This was the young lady who was employed at the bank. She sent Mr. Sharpley some flowers on Saturday, the day before he made his will, and called to see him at the hospital on Monday, the day after the will was made. She said he knew her, passed some remarks with her, and said he wished he was as happy as she looked to be. This was the young lady to whose card, that came with the flowers, the testator referred Mr. Lynam to get her name before writing the will. There were other witnesses, including the special nurse and the members of the Lynam family who testified that in their opinion the testator possessed testamentary capacity, but we will not discuss their testimony.

[3]  6.   Another fact of no little importance is that the disease from which the testator suffered and died was pneumonia, and it is a matter of common knowledge that this disease is progressive, that the patient grows worse and worse, if the disease proves fatal.   Pneumonia began with Mr. Sharpley, according to the doctor's testimony, on Saturday, the day before he made his will, and he died nine days thereafter.   It is true, and a matter of common knowledge also, that a victim of pneumonia may be very ill at a very early stage of the disease, but it is not an unreasonable inference in this case, considering the duration of the sickness, that the testator might have had a clear mind, and testamentary capacity on the second day of its progress.

While the law is clear that, even though the testator be delirious at times from disease, the will is valid if made at a rational period, we do not think it is necessary to discuss that subject, because there is no evidence that Mr. Sharpley was delirious on the day he made his will.   Certainly it cannot be assumed that, if he was delirious at some time on Monday, he must have been so at the time the will was signed on Sunday.

The following cases in which the testators were suffering from pneumonia, with stupor or delirium at times, are interesting, but we can do no more then mention them: *Speer v. Speer*, 146 *Iowa* 6, 123 *N. W.* 176, 27 *L. R. A.* (*N. S.*) 295, 140 *Am. St. Rep.* 268; *O'Donnell v. Rodiger*, 76 *Ala.* 222, 52 *Am. Rep.* 322; *Staples v. Wellington*, 58 *Me.* 453; *Case of Murphy*, 43 *Mont.* 353, 116 *Pac.* 1004, *Ann. Cas.* 1912C, p. 386.

[4, 5]  We come now to an important feature of the case, and that is the connection of William T. Lynam with the preparation and execution of the will.   He is made executor and trustee, and the members of his immediate family principal beneficiaries, under the will.   They receive about two-thirds of the estate. Because of these facts, and of the alleged fact that the will was not read, or its contents made known, to the testator before it was signed, the contestants claim that the will should be held invalid.

While they do not aver in their petition that the will was procured by undue influence, they say the law will imply undue in-

fluence under the facts in this case and invalidate the will. In support of this contention the case of *Davis v. Rogers*, 1 *Houst.* 58, is cited and relied on. But the important fact that distinguishes that case from the present one is that in the Davis-Rogers Case the question was whether it was shown by any *competent evidence* that the will was read to the testator, or its contents made known to him before signing.

In charging the jury in that case the court said:

"The law presumes in general, that the will was read by or to the testator. But if evidence be given that the testator was blind, or incapable from any cause of reading it, or if a reasonable ground be laid for believing that it was not read to him or that there was fraud, or imposition of any kind practiced upon the testator, it is incumbent on those who would support the will, to meet such proof by evidence, and to satisfy the jury, either that the will was read, or that its contents were known to the testator."

In the present case the testimony is uncontroverted that Mr. Sharpley expressed a desire to see Mr. Lynam; when he learned of such desire, Mr. Lynam went to see him, and was told by Mr. Sharpley he wanted him to draw his will; Mr. Lynam testified that Mr. Sharpley told him how he wanted to dispose of his property, and that he wrote the will in conformity with such instructions; that he read the will to Mr. Sharpley before it was signed and Mr. Sharpley said it was as he wanted it; that he then asked Mr. Sharpley whom he would have as witnesses, and they were called in and witnessed the will.

Counsel for the contestants argues that, because the testamentary witnesses testified that the will was not read in their presence, it was not read, or its contents made known, to the testator before it was signed. Mr. Lynam testified positively that he read the will to the testator before the witnesses were called in the room, and there is nothing in their testimony, or in any other testimony, inconsistent with that statement, unless the testimony of Mr. Stubbs, that he was in the room when Mr. Lynam came in with the will, remained there until he left with the will, and it was not read while he was in the room, should be so considered.

We do not think Mr. Stubbs' testimony, considered as a whole, is necessarily conflicting; but, assuming that it is, there is

certainly no contradiction of the testimony of Mr. Lynam that he received from the testator, several hours before the will was signed, specific instructions as to how it should be drawn. And it is undisputed that the will was drawn in strict conformity with such instructions. This is enough to show that the testator knew the contents of the will when he signed it. *Davis v. Rogers, supra; Duffield v. Robeson*, 2 *Harr.* 375. If he had such knowledge, it was not necessary that the will should have been read to him. It would have been unusual to read the will in the presence of the testamentary witnesses.

The language used by the court in the Davis-Rogers Case, and relied on by the contestants, does not, we think, apply to the present case. There can be no doubt that Mr. Lynam, although executor and trustee, and members of his immediate family principal beneficiaries, under the will, was a competent witness, under the law of this state, to prove the facts about which he testified no matter what may be said about the effect of his testimony. *Spiegelhalter's Will*, 1 *Penn.* 5, 39 *Atl.* 465; *Hudson v. Flood*, 5 *Boyce* 455, 94 *Atl.* 760.

But, while a competent witness, the law is well settled that under such circumstances stricter scrutiny is imposed, and stricter proof of capacity and volition required. The rule applicable to the present case is well stated in the case of *Duffield v. Robeson*, 2 *Harr.* 375, as follows:

"If the will be written by a person who is benefited by it, or by a person standing in the relation of counsel or attorney, and who is also benefited by it, these are circumstances to excite a stricter scrutiny and require stricter proof of volition and capacity. * * * Such proof is supplied by evidence of instructions given to the writer, that the testator read over the will, being of sufficient capacity to understand what he was reading, or by other evidence showing that he knew the will was in favor of the writer."

See, also, *In re Gordon*, 1 *W. W. Harr.* (31 *Del.*) 108, 111 *Atl.* 610-613; *Jones on Evidence*, § 191; *Post v. Mason*, 91 *N. Y.* 539, 43 *Am. Rep.* 692.

But while such is the law, and while the undisputed testimony shows that definite and full instructions were given to the writer and the will was written in conformity therewith, and while the

Opinion.

writer testified that he read the will to the testator before signing and he understood it, we cannot refrain from saying it would have been better in every way if some disinterested person had drawn the will. The fact that Mr. Lynam was the close friend and business adviser of the testator does not improve the situation at all. Close and confidential relations between the testator and writer, when the latter, or his family, are substantially benefited by the will, are more apt to arouse than allay suspicion, especially where the testator is blind or physically very sick and weak, no matter how honest the writer may have been. Under such circumstances the best thing for the friend and confidant to do is to decline to draw the will, if it is possible for the testator to secure the services of some other draftsman.

If another draftsman cannot be secured, and the will is written by a beneficiary, it would be well for him to read it to the testator, before signing, in the presence of some person who is not interested either in the will or the writer.

[6, 7] In the last analysis of the testimony we come to that given by Dr. Carmichael, the physician who attended Mr. Sharpley through his entire illness. He had known him for a long while intimately, and was very much interested in him during his sickness. If we should disregard the testimony of the Lynams respecting the testator's mental condition, because of interest, and that of the special nurse, because of certain admissions that affected its value, there would still be left in support of the will the convincing testimony of the doctor. He took nothing under the will, had no interest except in the welfare of his patient and friend, saw him every day, and mostly twice a day, from Wednesday, April 21st, until the day of his death, May 3d. He testified that Mr. Sharpley was feeling miserably on Wednesday, had a bad cough and cold, but his mind was perfectly clear; that pneumonia developed on Saturday, and while his temperature was high, his mind was entirely clear and continued so until a very short time before he died. The doctor saw his patient twice on Sunday, the day he made his will, in the morning between 9 and 10 o'clock, and in the afternoon about 6, and he was the only one, except certain

members of the Lynam family, and the testamentary witnesses, who did see him on that day. Necessarily we are much impressed with the testimony and opinion of the doctor respecting the mental condition of the testator on that day, and cannot escape the conviction that he had testamentary capacity at the time he made his will.

The case before the court is so strikingly similar in its facts to the recent Gordon Case above mentioned, 1 *W. W. Harr.* (31 *Del.*) 118, that the one might be said to be ruled by the decision in the other. In the Gordon Case the testatrix was suffering from pneumonia contracted about 10 days before she made her will. The will was executed 12 or 13 hours before her death, and for that reason it was a stronger case for the contestants than the present one. The attending physician, who wrote the will, selected the witnesses, and was made executor, was the most important witness for the propounders. Two of the contestants, nephews of the testatrix, testified that their aunt was as bad as she could be, incapable of making a will, and that after the doctor and the attesting witnesses left the room, one of them asked her if she knew what she had done, and she answered, "No."

In stating the facts the court said:

"According to all the witnesses Mrs. Gordon was a very sick woman, and critically ill for 10 days before her death. She was suffering from pneumonia and her condition grew worse from the time her sickness began until the end. Undoubtedly she was physically very weak, being in bed all the time and wholly unable to wait upon herself. Towards the last she had to be raised and held up when she took her medicine. When well she talked very little, and during her sickness scarcely at all."

It is true that in the Gordon Case there were two nurses in attendance upon the testatrix, in addition to the doctor, who testified that her mind was normal and she was mentally alert when she made her will, but they were the principal beneficiaries. In the present case, not only the doctor, but every other person who saw Mr. Sharpley on the day he made his will, testified, or had testified before the register, that he was then of sound and disposing mind and memory.

The court are clearly of the opinion, from the testimony in

the case, that Ellwood Frank Sharpley, the testator, was, at the time he made his will, of sound and disposing mind and memory. And adopting the language of the court in the Gordon Case, supra, we say:

"Such being our view of the testimony, we think the court would not be justified in directing an issue to be tried by a jury to ascertain whether the paper writing in question is or is not" the will of Ellwood Frank Sharpley. "While the court have the power to direct such an issue for their own assistance and information" (to enlighten their own conscience), "it is entirely within their discretion, and should not be done if it is clear from the testimony what their decision should be."

In the Cummins Will Case, 1 *Marv.* 423, 31 *Atl.* 816, it was said:

"This court has no difficulty in reaching a satisfactory conclusion in this case, without the trial of the issue sought by the appellants, and the needless and, therefore, unjustifiable delay and expense thereof."

And we say, additionally, in the present case, that the court should not evade the performance of a clear duty and responsibility by imposing the same on a jury.

The decree of the register of wills is, therefore, affirmed.