THE NEW YORK TRUST COMPANY, a corporation of the State of New York, as Administrator *c. t. a.* of the Estate of JULIA M. HUNGERFORD, Deceased,

> One of the Defendants Below, Appellant,

*vs.*

JULIAN RILEY and HUGHES SPALDING, as Executors of the Estate of JULIA M. HUNGERFORD, Deceased,

> One of the Defendants Below, Appellee,

AND COCO-COLA INTERNATIONAL CORPORATION, a corporation of the State of Delaware,

> Complainant Below, Appellee,

THE NEW YORK TRUST COMPANY, a corporation of the State of New York, as temporary Administrator of the Estate of JULIA M. HUNGERFORD, Deceased,

> One of the original Defendants Below, Appellee.

*Supreme Court, On Appeal, Oct. 29, 1940.*

LAYTON, C. J., and RICHARDS, SPEAKMAN, and TERRY, JJ., sitting.

*Clarence A. Southerland, Paul Leahy, Daniel O. Hastings,* and *Caleb R. Layton, 3d., (Marion Smith* and *J. Richard Bowden,* both of Atlanta, Ga., of counsel), for appellant.

*Richards, Layton & Finger, James A. Branch* and *Mac-Dougald, Troutman & Arkwright,* all of Atlanta, Ga. (*James A. Branch* and *Dan MacDougald,* both of Atlanta, Ga., and *Aaron Finger,* of Wilmington, of counsel), for the Executors.

Supreme Court, June Term, 1940.

LAYTON, Chief Justice, delivering opinion of majority of the court:

Coca-Cola International Corporation, a Delaware corporation filed its bill of interpleader in the Court of Chancery against The New York Trust Company, as temporary administrator of the estate of Julia M. Hungerford, deceased, and Julian Riley and Hughes Spalding, executors of the last will and testament of the deceased, to have determined the question whether the executors or the temporary administrator were entitled to new certificates for the shares of stock in the corporation belonging to the deceased at the time of her death.

Letters testamentary were issued to the executors in probate proceedings in Fulton County, Georgia, upon a probate of the will of the deceased in solemn form, all parties interested in the succession, either under the will, or as in a case of intestacy, having been cited to appear, on the theory that the deceased was domiciled in Georgia. The Surrogate's Court for the County and State of New York, upon the information of Robert Hungerford, surviving husband of the deceased, appointed The New York Trust Company as temporary administrator of the estate of the deceased, on the theory that she was domiciled in the State of New York as a matter of law, that state being the domicile of the husband.

The executors were directed to file a pleading in the nature of a bill of complaint setting forth their claim to

the stock in controversy; and the temporary administrator was ordered to file its answer. Later the will was probated in New York, and letters of administration *c. t. a.* were issued to the New York Trust Company.

It was asserted by the executors in their pleading that, at the time of Mrs. Hungerford's death, she was domiciled in Georgia; moreover, in any event, the matter was *res judicata* by reason of the litigation of the matter in the courts of the State of Georgia and the decisions of those courts holding that the deceased was domiciled in that state.

The answer of the administrator alleged that, at the time of her death, Mrs. Hungerford was, in fact and in law, domiciled in the State of New York; that no other state had the right to appoint a general domiciliary representative of her estate; and that the State of New York asserted a claim for inheritance taxes against the estate of the deceased.

By the decedent's will the surviving husband was bequeathed the sum of $5,000 and certain jewelry that he had given his wife. The remainder of the estate was devised and bequeathed to the mother and sister of the deceased.

Under the Georgia law, a husband, by renouncing a will, does not obtain any larger share of his deceased wife's estate; but in New York, the husband may renounce, and then would be entitled to claim the one-half part of the personal estate.

The case was heard by the Chancellor on oral testimony, stipulations of counsel, depositions and exhibits. He concluded that Mrs. Hungerford, at the time of her death, was legally domiciled in Fulton County, Georgia; that the executors named in the will of the deceased were entitled to certificates for the shares of stock in controversy; and that, having so found, it was unnecessary to consider whether the question of domicile was *res judicata*.

Julia Murphy was born in Atlanta, Georgia, and lived there all her life. She first married Mr. Whitehead, who built a handsome home on West Paces Ferry Road in that city. They were divorced, and in the property settlement Mrs. Whitehead acquired the home. She was, as it seems, a wealthy woman in her own right.

Robert Hungerford was born in Watertown, New York. After finishing school he went to New York and was employed by the National City Bank. Later he went into the business of manufacturing tile, a business controlled by his mother. He served in the army for about eighteen months. In 1931 or 1932 the tile business became so reduced that it was sold. What Mr. Hungerford's source of income was thereafter does not appear. He was interested in the stock market, and was in debt. He lived a bachelor's life in New York at hotels or in apartments, and at the time of his marriage to Mrs. Whitehead occupied rooms or an apartment at the Sherry-Netherlands Hotel in New York on a monthly basis, giving it up at his marriage.

Mr. Hungerford had known Julia Murphy as a young girl at Palm Beach, Florida. He met her when she was Mrs. Whitehead at Palm Beach, Hot Springs, Virginia, and in New York. In May, 1932, subsequent to her divorce, he met her again in New York, and there saw her frequently. They were invited to a house party at Cambridge, Maryland, and while there on June 12, 1932, they were married.

The appellees contend that a great variety of facts and circumstances show that Mr. Hungerford soon after the marriage, intended to make Atlanta his home, and that almost immediately after the honeymoon he actually made, and continued to make, that city his home.

The record is lengthy. A good deal of the testimony is not of great importance. The necessity for keeping the opinion within reasonable bounds forbids comment on all of the testimony; and in the main, comment will be limited

to the facts and circumstances selected by the parties as most important in establishing their respective theses.

After the marriage Mr. and Mrs. Hungerford went to New York. There they stayed at the Fairfax Hotel where Mrs. Hungerford had been staying prior to her visit in Cambridge, and not at the Sherry-Netherlands Hotel which had been the home of Mr. Hungerford. It is said that Mr. Hungerford, upon the surrender of his apartment had no fixed place in New York which he could call his home. That may be conceded. But thousands of people, in large cities in general, and particularly in the city of New York, live their lives in boarding houses, rooming houses, hotels or apartment houses, changing them from time to time, and giving up their quarters entirely if contemplating a protracted absence from the city, knowing that adequate living quarters in the city will always be available. Especially is this true of one who lives a bachelor's existence. The fact is a circumstance to be considered, but it is not inconsistent with domicile in the city of New York. *Brafman v. Brafman*, 144 *Md.* 413, 125 *A.* 161; *In re Craignish* [1892] 3 *Ch.* 180. Nor is it of especial importance that the married pair went to the wife's hotel in New York instead of to that of the husband. A bachelor's quarters in a hotel is not necessarily to be considered as an adequate or fit place for a newly married couple especially in a case where the spouse is a woman of wealth.

Before going to Europe as had been planned, Mr. and Mrs. Hungerford, after staying in New York a few days and later going to Atlantic City and Virginia Beach, went to Atlanta. They sailed for Europe on July 9. There they visited Mrs. Gatkins, a cousin of Mrs. Hungerford. Mrs. Gatkins, testified, speaking of the Hungerfords and the Atlanta home of Mrs. Hungerford, that "They always talked of the place," and that on several occasions both Mr. and Mrs. Hungerford urged Mrs. Gatkins to send her son to visit them in Atlanta. This evidence is offered as showing

that Mr. Hungerford had made and intended to make Atlanta his home. While admissible for the purpose perhaps, the significance of the evidence is not impressive. The expression, "they always talked about the place," is vague. Invitations, fixing no specific time for visit, are usually regarded as merely politic, not intended to be accepted. No obligation is incurred.

Before going to Europe Mr. and Mrs. Hungerford registered at hotels as being from New York. After their return, in their flittings from place to place, they invariably registered at hotels and clubs as from 509 West Paces Ferry Road, Atlanta, Georgia, the home of Mrs. Hungerford. A great deal of space in the record is devoted to this sort of evidence, and apparently the executors went to great expense to collect the proof. There was no denial of the fact, but a very reasonable explanation was offered. Mr. Hungerford testified that, as he and his wife contemplated traveling a great deal, a mailing address was necessary. He suggested the Sherry-Netherlands Hotel, but Mrs. Hungerford objected on the ground that this would necessitate notification to banks, corporations and many people, and suggested her Atlanta home as being more convenient. Mr. Hungerford was a bachelor with no business occupation. His wife was, as it seems, a wealthy woman with a large income. It may readily be supposed that her mail, in which naturally would be included business letters and dividend checks, was of far greater importance than was his. The arrangement made was the natural and sensible one in the circumstances. In the reported cases the fact of registration as from a given place of abode has not been regarded as of much weight in the determination of domicile. One has the undoubted right to register at hotels either from his domicile or from his temporary place of abode. *Chambers v. Prince,* (C. C.) 75 *F.* 176; *White v. Stowell,* 229 *Mass.* 594, 119 *N. E.* 121; *In re Curtiss' Estate,* 140 *Misc.* 185, 250 *N. Y. S.* 146.

It is urged that the evidence demonstrates that Mr. and Mrs. Hungerford established in Atlanta all those relationships which are associated with the common and ordinary conception of the word "home." A brief review of the facts is necessary.

Mr. and Mrs. Hungerford returned from Europe on November 9, 1932. After spending a few days in New York, they went to Atlanta, from there to Miami, Florida, where they remained for about ten days, and returned to Atlanta for the Christmas holidays where they occupied the wife's home. They entertained at that house, and there Mr. Hungerford's mother visited them. In the middle of January, 1933, they returned to Miami, and stayed there until about the middle of April. In Florida, Mrs. Hungerford suffered from some sort of a foot ailment, and they returned to Atlanta. The evidence, coming from Dr. Riley, Mrs. Hungerford's brother-in-law, and one of the executors of her will, is clear that the ailment "would not heal, and would not permit her to go on her feet and attend to any activities." She finally was compelled to go to a hospital in Atlanta where she was confined for about one month, and there her foot was operated on and she also underwent an appendectomy. Dr. Riley testified that the foot did not heal until after the operation. On October 12, 1933, they went to Hot Springs, Virginia. About November 20, they went to New York, and stayed until December 20, when they returned to Atlanta for the Christmas season; and it is remarkable that they did not occupy Mrs. Hungerford's house, but stayed all the while at the Georgian Terrace Hotel. About the middle of January, 1934, they went to Miami with Mrs. Riley, Mrs. Hungerford's sister, and Mrs. Murphy, her mother, and there they stayed until April 17. While in Florida, Mrs. Riley became very ill, and Mrs. Murphy suffered a stroke, compelling their return to Atlanta. As a result of a family conference, it was decided, Mrs. Riley being very ill, that Mrs. Hungerford was the proper person to look after the stricken mother, and the result was that Mr. and Mrs.

Hungerford took up their residence at the home of Mrs. Murphy in Atlanta. The residence, as it seems, was commodious, and any deficiencies with respect to furniture were supplied from Mrs. Hungerford's home. Mrs. Murphy's death was expected, but, as it frequently happens in such cases, there were alternating spells of sinking and improvement. In the summer of 1935, upon Mrs. Murphy's improvement, Mr. and Mrs. Hungerford went to New York, and from there to Atlantic City where they spent the rest of the summer. From there they returned to New York where they stayed for about two months. Mrs. Hungerford was ill. Upon her betterment they went to Atlanta about the first of November, and there, on Thanksgiving day, 1935, Mrs. Hungerford died. During the short married life of about three and one-half years, the only protracted occupation of Mrs. Hungerford's home in Atlanta was in the spring and summer of 1933, when she was suffering from the foot ailment and underwent the operations. It seems clear enough that Mr. and Mrs. Hungerford intended to summer at Narragansett Pier, Rhode Island. He, in fact, did go there in July, but returned to Atlanta upon learning from Mrs. Hungerford that her foot had not improved and that she was not able to leave Atlanta. The residence at Atlanta during this period of time would seem to have been enforced; and it was during the period that most of the entertaining at Mrs. Hungerford's house was done.

The evidence supports the conclusion that when the house was closed in the fall of 1933, it was never re-opened for living purposes.

At this point it is proper to notice certain evidence relied on by the executors as showing that the West Paces Ferry Road residence was, in truth and in fact, the home of Mr. Hungerford. The negro butler testified that in getting ready for one of the parties given by the Hungerfords, substantial alterations and improvements were made to the house, a porch was rebuilt and screened, and a lawn tennis

court "was placed on the terrace." It seems to us that the best evidence of the nature, extent and cost of the improvements to the residence would be the testimony of the contractor, builder or workmen who did the work. The evidence of the improvements is most general and vague; and it is noticeable that the executors, who apparently place reliance on the fact that improvements to the residence were made, and who certainly were not hampered by lack of money for the preparation of their case, did not see fit to procure the testimony of those persons best qualified on the point, but were content to rest on the testimony of the butler of Mrs. Hungerford. With respect to the tennis court the evidence is that it "was placed on the terrace." Grading, drainage, foundation building, surfacing, arrangements for back stops, all of those things necessary for a permanent tennis court, are not mentioned. Simply marking out the lines of a court on an expanse of turf is simple, easy to do, and quite inexpensive.

In this connection also, a witness testified that "Mr. Hungerford was talking about some plans that he seemed to be drawing up for the house and grounds and he spoke about an outdoor swimming pool." This utterly vague testimony is of little value.

In this same connection the appellees call attention to the fact that when the Hungerfords were living at the Murphy home, work was being done at the residence of Mrs. Hungerford. Statements contained in a letter written by Mr. Hungerford to his mother are quoted, and the inference is sought to be drawn from them that he regarded his wife's house as his home. He wrote, "We will stay here (referring to Mrs. Murphy's home) for the present as Julia has to run the house and take care of her mother's business. We are having five men work on the place on Paces Ferry, also housecleaning. I judge we may use it once in a while. However we are staying here for the present." An inference of domicile is not necessarily to be drawn from these expressions. It may likewise be inferred that residence in

Atlanta was compelled by Mrs. Murphy's condition. Mrs. Hungerford's property had necessarily to be cared for, and the more pretentious the estate the more care is required. There is nothing unusual about the necessity for work to be done on a large estate, even housecleaning, a very general term, whether the house is in occupancy or not. The clear inference to be drawn from the letter is that the house would be used only once in awhile, and other evidence shows that it was used during that period as a convenient place to give parties. In this connection the testimony of a witness called by the appellees is not without point. The witness was engaged in the real estate business in Atlanta. He had known Mrs. Hungerford from childhood. He was called presumably to prove that in 1934, when Mrs. Hungerford was living at her mother's home, she said that her own house was her home and was not for sale. In 1933, however, it would seem that the house was for sale, as he testified that he obtained permission from Mrs. Hungerford to show a prospective purchaser through the house; and he said that when Mrs. Hungerford was Mrs. Whitehead, he talked with her about selling the place, and that his friendship led him to believe that she was maintaining a play place there while she was staying with her mother.

It is in evidence on behalf of the appellees that, on the return of Mr. and Mrs. Hungerford to Atlanta from Florida in the spring of 1933, and during that summer when Mrs. Hungerford was incapacitated, the house was fully staffed with servants as a normally conducted house would be, and that regular meals were served there. On behalf of the appellant is the testimony of a friend of Mr. Hungerford who visited Atlanta for a period of ten days in the spring of that year, and who was with Mr. Hungerford almost daily during the period of his visit. He testified that Mrs. Hungerford's house was not fully opened up. Specifically he said, "We had no meals there. We had all our meals at her sister's house or at the club."

Certain it is that in the fall of that year the housemaids were paid off and dismissed. The butler had been dismissed some time before that. In October, being about to leave for Hot Springs, Virginia, the maid was paid and dismissed by Mrs. Hungerford, she saying to her, "Mr. Hungerford wants to close the house. I don't know why. When I come back I want you to come back and work for me." The other servant was paid and dismissed by Mr. Hungerford. She testified that he said they were closing the house for awhile, and told her "if you are not working when we come back we want you when we come back." This kind of expression is equivocal. The language is, "When we come back." The inference may, of course, be drawn that they intended to return and live in the house; but it is not unusual in dismissing servants to intimate that only necessity has caused the dismissal; that their services were valued; and that they would again be employed, without any intention of engaging them again. As a matter of fact, the house was not reopened again for living purposes, and when Mr. and Mrs. Hungerford, as has been said, returned to Atlanta for the Christmas season, the servants were not engaged, the house was not re-opened, and they lived during that season at the Georgian Terrace Hotel.

In March, 1933, Mr. Hungerford wrote to the West Side Tennis Club, near New York, requesting that his membership be changed from resident to non-resident, saying that his future address would be at the West Paces Ferry Road house in Atlanta; and at the same time and to the same effect he wrote the New York Athletic Club. The memberships were accordingly changed. In January, 1933, he applied for non-resident membership in the Piedmont Driving Club in Atlanta, giving his residence address as the Sherry-Netherlands Hotel in New York, and his business address as 101 Park Avenue, in that city, which was the business address of the tile company with which he had been connected. In March the club sent him notice of his election, addressing the letter to him at the Park Avenue

address. It was returned undelivered. Mr. Hungerford was then in Florida. In April the club wrote him at the house of Mrs. Hungerford in Atlanta saying that it had been brought to their attention that his residence had been changed to the city of Atlanta, and that if he desired to apply for resident membership a new application would have to be made. This application was made in May, upon Mr. Hungerford's return from Florida. In January also he applied for non-resident membership in the Capital City Club in Atlanta, giving his business address as 101 Park Avenue, New York. In November, 1934, the club wrote him that his classification of membership had been changed to that of resident member, he having taken up a residence in the county. The evidence is that he used the facilities of the clubs frequently. The character of membership in a club is generally determined by the fact of residence, and not by actual domicile. The testimony of the club's officials is to that effect. Many club members, contemplating a lengthy absence from the situs of the club, ask transfers to the non-resident classification to save expense, and the evidence clearly is that the New York clubs granted such transfers readily. It is to be noted that, consistent with his claim of domicile in New York, Mr. Hungerford made application for non-resident memberships in the Atlanta clubs. The non-delivery of the letter of notification was a *prima facie* showing that he was not in residence there. For the purposes of the club, as may be supposed, this was sufficient to compel a change of classification. Upon his return from Florida, Mrs. Hungerford suffering from the foot ailment, there was, of course, the possibility of a protracted stay in Atlanta. No person of sensibility is likely to debate a classification of membership in a club when, in fact, its facilities are being constantly used. In the case of the Capital City Club the change of membership was not compelled until November of 1934, when the Hungerfords had been in Atlanta for some months living at the home of Mrs. Murphy. The frequency of his appearance at the club may well have caused comment and

criticism. This is not uncommon. The fact is that, in both instances, the change of membership was an enforced, not a voluntary change.

The appellees contend that Mr. Hungerford engaged in one business in Atlanta, and contemplated another business there.

Shortly after the marriage, Mr. Hungerford caused to be incorporated in Delaware the Trebor Securities Corporation for the purpose of trading on the stock market. Mrs. Hungerford furnished all of the capital and she owned all of the stock. The bank account of the corporation was at a New York Bank. The address "to which letters, statements from the bank and other communications were to be sent," was given as the West Paces Ferry Road house in Atlanta. In Atlanta, Hungerford had no office. He frequented the brokerage establishment of Beers and Co. The corporation had a safety deposit box in Atlanta, it having been rented in June, 1933. There Mr. Hungerford kept certain personal effects. These are undenied and undeniable facts, but we are unable to draw sure inferences from them. Mr. and Mrs. Hungerford had planned to travel a good deal, and did so. The mailing address at her home in Atlanta had been decided upon. The instruction to the New York bank for the forwarding of communications was consistent with the mailing address agreed on. Trading on the market is a transitory matter. An individual trader, ordinarily, needs no office, and the securities corporation was essentially individual. Trading on the market can be done while travelling. Brokerage houses welcome traders. Having a safety deposit box conveniently at hand has little bearing on the question of domicile.

In January, 1934, it appears that Mr. Hungerford wrote the attorneys in New York who had organized the Securities Company, saying that as it was very doubtful that he would be in New York for a good many months, it would be for his own best interest to have the tax returns of the corpora-

tion made up in Atlanta where he could give it the necessary attention. Trading on the exchange had been done in Atlanta, and it is reasonable to suppose that the records and papers necessary for the making up of tax returns were there. Atlanta was a convenient place of the preparation of the tax return. New York was not. But the inference the appellee draws from the statement is not compelled. In *Matter of Davis, (D. C.)* 217 *F.* 113, the question was whether a bankrupt was domiciled in New Jersey or California. In a letter he stated, "I doubt if I shall see East Orange for some months yet." The learned court regarded the expression as significant, and as indicative of an intention to return to his old home.

Julian Riley, one of the executors, testified that Mr. Hungerford was investigating, as he believed, the possibility of representing National Distillers Company, or some branch of it, in Georgia, as a wholesale whiskey representative; and that he had selected one of the vacant Murphy properties in Atlanta as a warehouse. It was also in evidence on behalf of the appellees that in 1935, Mr. Hungerford approached a business man in Atlanta for a letter of introduction to someone connected with National Distillers Corporation for the purpose of obtaining an agency in Georgia for some large whiskey manufacturing concern, and a letter of introduction was accordingly given.

The explanation given of this circumstance by Mr. Lamphier, a graduate of West Point, and a former officer in the United States Army, is sufficient to repel the inference sought to be drawn from it. He testified that he knew Mr. Hungerford; that about the time the people of Georgia were considering the repeal of the prohibition laws of the state, he, in New York, called Mr. Hungerford, in Atlanta, and talked with him over the telephone, for the purpose of asking him whether he could assist him in getting an agency for any of the large distilling companies in Georgia, and, if such agency could be procured, to obtain assistance in

financing the project; that Mr. Hungerford replied that he had some connections that might help him in financing the proposed business, and knew a man closely connected with National Distillers Corporation; but said that if he, Lamphier, was interested in taking an agency, he would have to move from New York to Atlanta, as he, Hungerford, was not interested in tying himself up.

The evidence most strongly relied on by the appellees is given in regard to the income tax returns of Mrs. Hungerford for the years 1933 and 1934. Mr. Hungerford, for those years had no taxable income to report and filed no returns anywhere. Mrs. Hungerford's returns were made up by public accountants engaged by Mr. Hungerford, and were filed in Georgia, and while Mrs. Hungerford, at times at least, was present at conferences, Mr. Hungerford, in general, looked after the matters.

Under the *Georgia Income Tax Law, Code Ga.* 1933, § 92-3002, the word resident is defined as follows:

"The word 'resident' means natural persons, and includes, for the purpose of determining liability to the tax imposed by this law upon or with reference to the income of any taxable year, any person domiciled in this State, and any other person who maintains a place of abode within the state and spends in the aggregate more than six months of the taxable year within the state."

The income tax blanks of the State of Georgia contained the following questions:

"Were you a resident of the State of Georgia on December 31st, 1932 (or the year for which the return is made)?

"If not, did you spend in the aggregate more than six months within the taxable year within the state?"

In both of these years Mrs. Hungerford was taxable as a resident she having maintained a place of abode in the state and having spent therein more than six months of the taxable year. To the first question she answered, "Yes"; and this circumstance is seized upon as proving conclusively that she was, with her husband's knowledge and approval,

domiciled in the State of Georgia. Mr. Moore, a public accountant employed by the firm that prepared the tax returns, testified that the full exemption of $3,500 was taken by Mrs. Hungerford at Mr. Hungerford's direction.

The learned court below misconceived, as we think, the meaning and effect of the Georgia law, and drew an inference that was not warranted. In the statement of facts it was said, "Under the Georgia law, a person domiciled in that state was entitled to an exemption for income tax purposes of $3,500, while other taxables were merely entitled to an exemption of $1,000. Mrs. Hungerford claimed the $3,500 exemption on her report." In the oponion proper it was said,

"Under the law of Georgia, a person who resides in that state for more than six months in any one year is required to pay an income tax. The exemption given such a person is, however, much less than that allowed a person who is domiciled there. Mrs. Hungerford, in effect not only stated in her state return that she was domiciled in Georgia, but claimed and deducted an exemption accordingly."

The definition of the word resident in the Georgia law is plain and clear. Included in the definition are two classes of persons, those actually domiciled in Georgia, and those, who, although domiciled elsewhere, have maintained a place of abode within the state and have spent in the aggregate more than six months of the taxable year in the state. Each of these classes of persons are required to pay the Georgia tax on all their income wherever it may have accrued, and all married persons living with husband or wife, who are within the embrace of the definition, are entitled to the same exemption of $3,500. The first question on the tax return blank does not purport to distinguish between domiciled persons and resident persons. The exemption of $1,000 mentioned by the learned Chancellor would seem therefore to be that allowed to non-residents who in Georgia, as in many states, are required to pay income taxes on income received from property owned or business conducted in the state. Mr. Tomkins, the public accountant called by the

appellees, testified that a person in the situation of Mrs. Hungerford would answer the first question by "Yes," and would not answer the second question.

The witness, Moore, actually made up the returns. He testified that he understood from Mr. Hungerford that he was a resident of New York; and such was the impression made upon him that he made an office memorandum for the attention of his superiors. The memorandum was as follows:

"It is questionable under those conditions whether or not a married person is entitled to the full exemption where one maintains residence in one state and the other maintains residence in a different state."

Mr. Tompkins, the resident partner of the firm of accountants, also called by the appellees, contradicted his employee. He testified that Mr. Hungerford gave his address as at the West Paces Ferry Road residence; that he regarded him as a resident of Atlanta; and that the memorandum submitted by Mr. Moore did not at all raise the question whether Mr. Hungerford was a resident of New York, but as he testified,

"We had reference to what was shown in the income tax return that Mr. Hungerford had made and returned to New York. That was shown in the 1932 return, and we followed that in the 1933 return, which was the first one we prepared."

It is difficult, and at times unpleasant, to choose between contradictory statements; but we see no sufficient reason not to accept the positive testimony of Mr. Moore.

In view of this positive testimony we are unable to say that deception was practiced upon the accountants by Mr. Hungerford. They had knowledge that his claimed residence was in New York. Whether he knew that the Federal income tax returns of his wife should have been filed in New York, and whether he knew that it was necessary that a return of his wife's income should be made to the State of New York, are matters not disclosed by the evidence. The maxim is, of course, that every one is presumed

to know the law, and the facts are properly to be considered in estimating the weight to be given to the particular evidence; but we are not satisfied that, from them, domicile of Mr. Hungerford in the State of Georgia is an inevitable deduction.

In August and September of 1935, Mr. Hungerford wrote accountants in Atlanta that Mrs. Hungerford had been ill in New York but would return to Atlanta when well and would then pay any tax due the government; and that any claim of the government for taxes would be taken up and given proper attention upon her return to Atlanta.

These expressions of intent to return to Atlanta have no great significance. Undoubtedly Mr. and Mrs. Hungerford intended to go back to Atlanta in the fall of 1935. Her mother was ill there. All of the papers and records necessary for any correction of income tax returns were there.

It is in evidence that when Mr. and Mrs. Hungerford left Atlanta in the summer of 1935 she told her personal maid that she expected to be gone only a few weeks; that she wrote her maid referring to her Atlanta residence as her home, and gave instructions for the care of the lawn; and that upon her return she stated to a friend of hers that she was glad to be back and "would be there right along." At best these statements are ambiguous. Moreover, there is no evidence that they were made in her husband's presence, or that he had knowledge of them. Declarations of a wife are not evidence that controls the domicile of her husband. *Chambers v. Prince, supra; Parsons v. City of Bangor*, 61 *Me*. 457.

Non-residents, under the Georgia law as we understand it, were allowed to operate automobiles without a Georgia license for a period of thirty days only. This, or a similar limitation, is a usual one, and the fact that an automobile of Mr. Hungerford was licensed under the Georgia law is of the least significance.

Mr. Hungerford testified that, upon his marriage, he and his wife discussed the matter of their future residence; that he told her that he wanted to go back into business, and had the promise of financial backing by a friend; that his wife replied that as he was not in business at the time, it was her desire to travel for two years, and that then she would be willing to settle down permanently in New York. To this he replied that he was not financially able to travel, and wanted to rehabilitate himself in business, but that this objection was met by his wife's saying that she had ample money, and that the plan of travel would be a wedding present to both of them.

This is the basis for the appellant's contention that there had been no change of Mr. Hungerford's domicile.

Statements made by a deceased person related by one expecting to benefit from them are to be scrutinized carefully. If they are unsupported by other evidence, they may be given little or no credit. But, in the instant case, there is ample evidence and from disinterested witnesses that Mr. Hungerford made statements of his plans and purposes when, obviously, there was no reason to speak other than the truth; and that Mrs. Hungerford herself stated on several occasions that she and her husband intended to live in New York but were going to travel for some time, or statements of similar import. The fact is that they did travel extensively. During their short married life they stayed for varying periods at more than twenty hotels and clubs.

It is not disputed that, at the time of his marriage, Mr. Hungerford was domiciled in the city of New York. Their application for passports, and banking account in Paris while they were in Europe bespoke the fact. Certainly shortly after their return from Europe in the fall of 1932, they were looking for a cooperative apartment in New York City. Under the guidance of a well known real estate man, Felix Isman, they were shown a number of apartments. He later received a letter from Mrs. Hungerford saying that some-

thing had happened that would take them away from the city, and that upon her return she would conclude the matter. Furthermore, the matter of Mrs. Hungerford's furniture in Atlanta was discussed; and the witness related that Mr. Hungerford said that if she could sell her house with the furniture she was going to do it, but if not she could move the furniture to New York. Cecelia Wheeler testified that after his marriage she was told by Mr. Hungerford that he and his wife had been travelling in Europe, and visiting in Atlanta with his wife; that they were going to look for a cooperative apartment in the city; and that upon her trying to interest him in purchasing her home in Spring Lake, New Jersey, he said he would not live anywhere but in New York City. Helen Best testified that she attended the Hungerford wedding; that about that time Mrs. Hungerford put through a long distance call to Atlanta, and heard her give instructions to put her Atlanta residence on the market for sale; and that she had frequent conversations with Mrs. Hungerford in which was discussed their renting or buying an apartment in New York. James Converse testified that the Hungerfords told him in Atlanta in 1933, that they were only temporarily in Atlanta as they were going south for the winter. The contract bridge expert, Hal Sims, testified that in the fall of 1933, he attempted to sell the Hungerfords one of his properties in New Jersey, but that he understood from them that they preferred to live in New York and were living there at the time. Harry Whitlock testified that, soon after the marriage, both Mr. and Mrs. Hungerford said to him that the Atlanta house would probably be sold, or closed; that they intended to travel for a year or two, and that it was their intention to get an apartment and live in New York. Mrs. John Gaston testified that possibly a year after the marriage she asked the Hungerfords when they were going to settle down, and that they said they were going to visit Mrs. Hungerford's mother, and were going to Miami for awhile; that she tried to interest them in buying a place on Long Island, but they said they

were going to take a cooperative apartment in New York; and that Mrs. Hungerford said the only place in which her husband would be happy was New York. Tom L. Johnson testified that in the fall of 1933 Mrs. Hungerford told him that she and her husband were going to Florida, but would be back in New York in the spring and would make their home there. Minna Lee testified that in the Florida season of 1933, at Miami, Mrs. Hungerford told her that she and her husband were travelling a good deal and were making their home in New York City; and that in the season of 1934, Mrs. Hungerford told her that they were called to Atlanta as her mother was very ill. John Gaston testified that he met Mrs. Hungerford for the first time after her marriage with Mr. Hungerford; that he was a house guest of the Hungerfords in Atlanta in the spring of 1933; that possibly six months later the Hungerfords told him they were trying to sell the Atlanta house but that it had not been done; and that in the fall of 1935, in New York, when Mrs. Hungerford was improving after an illness, he and Mr. and Mrs. Hungerford spent three or four days in looking at apartments; and that when he saw her off on the train she said she was going down to Atlanta for possibly two weeks or so; that she wanted to get her clothes and things, and come back to live in New York. Felix Isman also testified that in 1935, shortly before Mrs. Hungerford's death, when she and her husband were in New York, he heard again from Mr. Hungerford about an apartment. He understood from Mr. Hungerford that they had been detained in Atlanta by reason of illness in Mrs. Hungerford's family, and again were desirous of finding an apartment in New York. He got a further list of apartments, a half dozen places perhaps, and looked them over with Mr. Hungerford.

When sued in Atlanta upon service by copy made at the Atlanta residence, Mr. Hungerford made affidavit of non-residence in the State of New York. On the part of the appellees it is pointed out that when the issue of residence was before the court for hearing, Mr. Hungerford default-

ed. We see, however, no reason to infer perjury or bad faith in this circumstance. If he hoped to compromise the suits, and that appears to have been his purpose, time was needed. If, in fact, he was not a resident of Georgia, he could obtain time by objecting to the jurisdiction of the court. This is done constantly without suggestion of false purpose.

For some reason Mr. Hungerford wanted to change his name. His attorney in New York advised him that this could not be done in New York unless he were a resident of that state; and that he saw no reason why he could not claim a hotel residence in New York City if he had not voted in Atlanta. To this letter Mr. Hungerford replied that he regarded New York City as his place of residence and claimed the Sherry-Netherlands Hotel as his last residence.

This court, ordinarily, will not disturb a finding on the facts in a hearing before the Chancellor, if it appears from the record that there was evidence to support the finding. *Chalfont v. Reinhardt,* 12 *Del. Ch.* 389, 113 *A.* 674. The reason for the rule, generally observed by the reviewing courts, is that the trial court sees and hears the witnesses, and is, therefore, the better able to determine the credit and weight to be given to their testimony. *Henderson v. Plymouth Oil Co.,* 16 *Del. Ch.* 347, 359, 141 *A.* 197. The reason for the rule falls when a large part of the testimony was not presented orally, as here. Moreover, a finding of fact is something different from an inference from facts; and in such case we have not hesitated to draw our own inferences. *Peyton v. William C. Peyton Corporation,* 23 *Del. Ch.* 321, 7 *A.* 2d 737, 123 *A. L. R.* 1482.

The ultimate fact in issue is domicile. This is a question of law based on facts. The so-called finding of fact is a deduction, a process of reasoning or logical inference. In such case the reviewing court is as competent to judge of the correctness of the conclusion as is the lower court. *In re Dorrance,* 309 *Pa.* 151, 163 *A.* 303. As an appeal is a review of both law and fact, it is the duty of this court, in the in-

stant circumstances, to draw its own inferences and to reach its own conclusions.

We are not concerned here with a situation where, in appropriate circumstances, a wife may select a domicile apart from that of her husband. The rule of the common law, founded on the theoretic identity of husband and wife, and still demanded by the theory of civilized law, is that a woman, on her marriage, loses her domicile and acquires that of her husband, no matter where she resides, or what she believes or intends. The domicile of the wife is with her husband, not as a matter of evidence or of presumption, but as a matter of law. 17 *Am. Jur.* 614, *et seq.;* 1 *Beale, Confl. Laws,* 198.

A domicile once established remains the legal domicile until a new one is acquired. The essentials of domicile of choice are the fact of physical presence at a dwelling place and the intention to make that place home. There must be a concurrence of fact and intent. The absence of either precludes the change. *State v. Frest,* 4 *Har.* 558. There must be an actual abandonment of the first domicile coupled with an intention not to return to it, and the acquisition of a new domicile by actual residence in another place with the intention of making that place a permanent home. Whether one has changed his domicile from one place to another must depend largely on his intention. The intention must be of permanent or indefinite living at a given place, not for mere temporary or special purposes, but with a present intention of making that place home unless or until something uncertain or unexpected shall induce the adoption of some other permanent home; or, negatively expressed, there must be an absence of any present intention of not residing at the place permanently or for an indefinite time. It follows that absence from one's place of residence, even for a long time on business, pleasure, reasons of health, education of children, or other special purpose, will not affect a change of domicile if, all the while, the person intends to be absent only

for the accomplishment of the temporary purpose and to return to his former place of residence upon the fulfillment of the purpose. The intention to return must, of course, be fixed, certain and constant. A loose, indefinite, or as it is called, a floating intention to return will not avail to prevent a change of domicile. Declarations of intention or purpose are, of course, admissible, but they must give way to definite and unequivocal acts and conduct. 17 *Am. Jur. Title, Domicile;* 1 *Beale, Conf. Laws,* 133, 186, 198, 246; *Texas v. Florida,* 306 *U. S.* 398, 59 *S. Ct.* 563, 830, 83 *L. Ed.* 817, 121 *A. L. R.* 1179; *Collins v. City of Ashland,* (*D. C.*) 112 *F.* 175.

The evidence affirmatively showed that Mr. and Mrs. Hungerford planned to travel for a period before settling down in an apartment in New York City. They did travel extensively. They occupied Mrs. Hungerford's home for several months in the spring and summer of 1933 because of Mrs. Hungerford's physical condition. In the autumn of that year they began to travel again. The Atlanta house was closed and left in charge of a caretaker; the servants were dismissed; and it was never lived in again. In 1934, contrary to their desires and expectations as Mr. Hungerford testified, they were compelled by the illness of Mrs. Murphy to remain in Atlanta, and during this period they lived at her home. When in 1935, it appeared that Mrs. Murphy's condition had improved, they left Atlanta, spent the summer at Atlantic City, went to New York in the fall, and there again began a search for a suitable apartment. And, as she left New York for Atlanta, she made the unequivocal statement that she wanted to get her clothes and things and come back to live in New York.

There is nothing in the record before us suggestive of discord between Mr. and Mrs. Hungerford. There is no evidence of clash of opinion or desire with respect to their residence. On the contrary, disinterested witnesses have testified to repeated statements of purpose and intention

on the part of both of them to make their home in New York, not only at the beginning but close to the end of their married life. Apart from conjectural inference there is nothing to indicate that Mrs. Hungerford's willingness to live in New York depended upon the sale of her Atlanta property. The two extended periods of residence in Atlanta are accounted for, and, as we think, satisfactorily. It is argued that during the period of Mrs. Murphy's illness there was ample time for Mr. Hungerford to go to New York and there establish a residence. This may be conceded. But it is not likely that he would have selected an apartment in the absence of his wife. Husbands, as a rule, are not so bold. Separating himself from his wife during her mother's illness when she was compelled to supervise her mother's house and to look after her business affairs would, perhaps, have been regarded as conduct selfish and heartless. It does not follow that Mr. Hungerford, by conduct, adopted Atlanta as his home because, in the clutch of the circumstances, he did not press for removal to New York.

The learned Chancellor observed that the fair inference from the evidence was that any contemplated removal to New York depended largely on what was to be done with the Atlanta house and he specifically held that the evidence justified the conclusion that long prior to the death of Mrs. Hungerford, Mr. Hungerford, in point of fact and purpose had made Atlanta his home, and had continued to make it his home for an indefinite time; and that any possible intent on his part to return to New York depended on the attitude of Mrs. Hungerford, and was, therefore, a mere hope or wish, of any indefinite, floating nature that in no way affected his becoming legally domiciled in the State of Georgia.

In the consideration of the case there is no reason, we think, to disparage the evidence adduced by the appellant and exalt that of the appellees. Both the executors and Mr. Hungerford have a monetary interest in the outcome of the

controversy. The suggestion that an impecunious man who marries a wealthy woman probably is indifferent to his place of domicile, and will readily accept the domicile of the wife as his own, needs be guarded against. We know of no principle of law that attributes to a person mean and ignoble motives except as a reasonable inference from proven facts. That there are many residents of the city of New York who believe that residence in that city is one of the greatest of human blessings is readily conceivable. Honesty of purpose and intent must be presumed unless the facts compel a contrary conclusion.

We have studied the long record carefully and argumentatively; and, applying the law to the facts of the case, we are unable to find in the evidence justification for the conclusion that Mr. Hungerford's intention to return to New York was so uncertain and indefinite that his domicile in Georgia must be inferred. The intention of a person absent from his place of residence to return to it is an important fact to be considered in determining a question of alleged change of domicile. His acts and conduct may be such as to transcend his expressed intention, but the evidence, in such case, must be certain and unequivocal.

It is a fundamental proposition that one whose right to relief depends on the establishment of the domicile of another at a given place has cast on him the onus of proof. This burden never shifts, although, from time to time, the duty of going forward with the evidence may shift from the one party to the other. The fact of actual residence in a place is *prima facie* evidence of domicile there; and in the absence of explanatory evidence, the conclusion would be justified that the place of residence is the democile of the person there resident. Upon proof of residence, explanation is demanded. The explanation may, or may not, be satisfactory. But, nevertheless, the party asserting and relying on a change of domicile sustains the burden of proving the change by a far preponderance of the evidence. 17 *Am. Jur.*

640; 2 *Jones. Ev.* § 176; *Page v. Camp Mfg. Co.* 180 *N. C.* 330, 104 *S. E.* 667; *Zenner v. Goetz*, 324 *Pa.* 432, 188 *A.* 124.

We are of opinion that the appellees did not sustain the burden of proof. It follows that the domicile of Mr. Hungerford, at the time of the death of his wife, was in the State of New York, and, therefore, as a matter of law, the domicile of the testatrix, his wife, was in that state.

The second question for decision is one of law. The appellees contend that the question of Mrs. Hungerford's domicile is *res judicata* by reason of the judgments of the Georgia courts in the probate in solemn form of her will. The facts relative to those proceedings are stated at length in the opinion of the late Chancellor Wolcott, in *Coca-Cola International Corporation v. New York Trust Company, et al.,* 22 *Del. Ch.* 344, 2 *A.* 2d 290, and need not be restated. The important fact is that, while Mr. Hungerford was cited to appear in those proceedings, and did appear, and did file a *caveat* against the allowance of the will, and did pursue his contention to the Georgia Supreme Court, yet the appellant was not a party to those proceedings.

It is admitted that the situs of the shares of stock in controversy is in this state. We have found as a fact that the domicile of Mrs. Hungerford, at the time of her death, was in New York. While there may be two administrations in the same estate, the one domiciliary, the other ancillary, the principal administration of appointment must be that place where the deceased had her last domicile. All the authorities concur in the conclusion that, according to the principles of international law universally adopted, the administration had at the domicile of the decedent is to be regarded as the principal administration, and that all other administrations, granted by reason of personal assets found in a state foreign to that of the domicile, are regarded as subordinate or ancillary. The administration at the place of domicile is, in its nature, general and unlimited, while the ancillary administration is special and limited. Civil-

384

ized nations recognize the principle that the personal es-
tate of a deceased person, for the purposes of succession
and distribution, has no other locality than that of his domi-
cile. Subject only to the right of a foreign state to adminis-
ter property within its borders for the protection of its own
citizens, the domiciliary representative becomes invested
with the title to all of the personal property of the deceased
for the purpose of collecting the effects of the estate, paying
the debts, and making distribution of the residue according
to the law of the place of domicile or the directions of the
will as qualified by that law. *Wilkins v. Ellett, Adm'r.,* 9
*Wall.* 740, 19 *L. Ed.* 586; *Vogel v. New York Life Insurance
Co.,* (5 *Cir.*) 55 *F.* 2d 205; 11 *R. C. L.* 429.

An administrator with the will annexed may, in general,
exercise the same powers and authority that could have
been exercised by the executor named in the will had he
qualified. Accordingly, it is contended that the domiciliary
representative alone has the right to maintain a suit in
Delaware on behalf of the estate for the recovery of assets.

If any portion of the estate of a decedent is situated in
a foreign state, the domiciliary representative, apart from
statute, cannot recover possession by suit without taking out
ancillary letters in the foreign jurisdiction, not because of
any defect of title to the possession, but as a qualification of
the general principle in respect of personal property by the
comity of nations, founded on the policy of the foreign
state to protect the interests of its home creditors. *Wilkins
v. Ellett, Adm'r., supra; St. James' Church v. Walker,
Adm'r.,* 1 *Del. Ch.* 284. This rule is not applicable in Dela-
ware because of statutory provisions. *Deringer's Adm'r. v.
Deringer's Adm'rs.,* 5 *Houst.* 416, 1 *Am. St. Rep.* 150; *Ter-
ry v. Stull,* 19 *Del. Ch.* 412, 168 *A.* 251.

The statute, *Revised Code* 1935, *Secs.* 3868-3870, pro-
vides that letters testamentary, or of administration, grant-
ed in any other state, and produced under the seal of office,
or court, granting the same, shall be received in this state

as competent authority to the executor or administrator, therein named; and the effect of the statute is to allow suits to be brought by foreign executors and administrators, under the limitations of the statute, without grant of ancillary letters in this state. *Terry v. Stull, supra.*

Such statutes refer to domiciliary executors or administrators, and not to subordinate or ancillary representatives. This is implicit in the language of the Court of Errors and Appeals in *Deringer's Adm'r. v. Deringer's Adm'rs., supra,* where it is said "the law of this state has provided a very simple substitute for ancillary or subsidiary administration," recognizing, as we think, the fact that the foreign representation must be primary or domiciliary; and such statutes are so construed. *Harrison v. Mahorner, Ex'r.,* 14 *Ala.* 829; *Moore v. Jordan,* 36 *Kan.* 271, 13 *P.* 337, 59 *Am. Rep.* 550; and see *Taylor, Adm'x., v. McKee, Adm'x.,* 121 *Ga.* 223, 48 *S. E.* 943. It would seem to be clear that the statute is an enabling act; and that its purpose is to remove a disability, not to confer additional rights and powers on representatives of decedent's estates.

The case before us ought not, however, to be decided on grounds that may be thought technical; and the essential question is whether the domiciliary administration, the appellant here, is bound by the Georgia judgment rendered in a proceeding to which it was not a party. The answer must be, on principle and authority, that it was not bound by that judgment.

Due process of law means law in accordance with the fundamental principles of justice, and its essence is notice of an opportunity to be heard before judgment. *Spoturno v. Woods,* 8 *W. W. Harr.* 378, 192 *A.* 689.

The late Chancellor, in *Coca-Cola International Corporation v. New York Trust Company, supra,* accurately stated the legal principles by which the case must be governed. In that case the Chancellor was confronted with a

motion for decree notwithstanding an answer alleging, *inter alia,* that the true domicile of Mrs. Hungerford, the testatrix, was in the State of New York. The truth of the allegation, for the purpose of the motion was, of course admitted.

The learned Chancellor was of opinion that it was inherent in the decision of the Court of Errors and Appeals of this state, in *Deringer's Adm'r. v. Deringer's Adm'rs.,* 5 *Houst.* 416, 1 *Am. St. Rep.* 150, that the domiciliary representative of a deceased person is entitled to receive and administer all of the personal estate of the deceased wherever found, subject to the right of a foreign state to administer property within its borders for the protection of its citizens, and that the proposition was practically of uniform acceptance in this country, citing *Wilkins v. Ellett, Adm'r.,* 9 *Wall.* 740, 19 *L. Ed.* 586; that under the full faith and credit clause of the *Federal Constitution, Art.* 4, § 1, and the Act of Congress passed in pursuance thereof, 28 *U. S. C. A.* § 688 inquiry was not precluded into the jurisdiction of the court in which judgment is rendered over the subject matter, or the parties affected by it, or into the facts necessary to give jurisdiction, citing *Mitchell, Vance & Co. v. Garrett, Ferris & Co.,* 5 *Houst.* 34; *Thormann v. Frame,* 176 *U. S.* 350, 20 *S. Ct.* 446, 44 *L. Ed.* 500; and that the appointment of the administrator *c. t. a.* in New York, as well as the appointment of the executors in Georgia, were essentially judgment in *rem,* final and conclusive as to property located in the appointing jurisdiction, but the property located in this jurisdiction was not a subject matter within the operation of either of those judgments, citing *Overby v. Gordon,* 177 *U. S.* 214, 20 *S. Ct.* 603, 44 *L. Ed.* 741. Expressing no opinion on the question whether the Georgia judgment might not be pleaded as an estoppel against a party who was cited to appear and did appear in the probate of the will in solemn form in the Court of Ordinary of Fulton County, Georgia, if such party were to seek elsewhere to relitigate against the executors the question of

the Georgia domicile, the Chancellor proceeded to say that such contention could not be made in the case before him for the reason that the New York administrator was neither a party to the Georgia proceeding nor in privity with such party; and he concluded that there was power in the appropriate Delaware tribunals to determine, so far as the property located in this state was concerned, where the deceased testatrix was domiciled at the time of her death to the end that the local effects might be sent to the seat of domiciliary administration.

We have found as a fact that the domicile of the testatrix was in the State of New York at the time of her death, and the situation that confronts us is precisely the same as that before the late Chancellor.

A discussion of the many cases cited in the briefs would extend this opinion to an unreasonable length; moreover the principle involved is so universally accepted that discussion is unnecessary. No case cited either by the appellant or the appellees suggests that one who is neither party to a judgment nor in privity with a party thereto is, or may be, bound by the judgment under the full faith and credit clause of the Federal Constitution.

*Tilt v. Kelsey,* 207 *U. S.* 43, 28 *S. Ct.* 1, 52 *L. Ed.* 95; *Burbank v. Ernst,* 232 *U. S.* 162, 34 *S. Ct.* 299, 58 *L. Ed.* 551; *Baker v. Baker, Eccles & Co.,* 242 *U. S.* 394, 37 *S. Ct.* 152, 61 *L. Ed.* 386; *Holland v. Jackson,* 121 *Tex.* 1, 37 *S. W.* 2d 726; *In re Fischer's Estate,* 118 *N. J. Eq.* 599, 180 *A.* 633, are in accord with the principles announced in *Thormann v. Frame, supra,* and in *Overby v. Gordon, supra.*

All of them are cases involving disputes with respect to domicile as between domiciliary and ancillary administration of decedents estates. In all of the cases the principle is declared that a judgment of probate cannot, as a judgment in *rem,* bind the courts of another state on the question of the domicile of the decedent.

In *DeMora v. Concha, L. R.* 29 *Ch. Div.* 268, affirmed
in the House of Lords, *L. R.* 11 *App. Cas.* 641, cited with
approval in *Thormann v. Frame* and *Overby v. Gordon,* it
was in dispute whether a decedent was domiciled in Eng-
land or in Chile. The London Probate Court, upon a caveat
filed against the probate of a will by a daughter of the
deceased, and issue framed, expressly decided in favor of
the domicile being in England and not in Chile, as claimed
by the daughter. Later, in a subsequent action in the Court
of Chancery for distribution of assets, the daughter again
sought to litigate the question of the domicile of her father,
and she was allowed to do so against the objection that the
judgment of the court of probate on the question of domicile,
was conclusive first as a proceeding in *rem* which operated
as an estoppel against all the world; and second, as a pro-
ceeding *inter partes,* operative as *res judicata* by reason of
the actual contest made by the daughter. But Lord Black-
burn, in the House of Lords, observed that the decision of
the court of probate was conclusive on all the world only to
the extent that there was an executor who was entitled to
have probate in England for the purpose of getting in and
taking the property which was in England, and to that he
was entitled if there was a will which made that executor
a good executor according to the law of England; but that
the judge of probate had no right to say that the testator
was or was not really a domiciled Englishman, and no court
of another country would be obliged to admit that the de-
cedent was a domiciled Englishman. And, on the assump-
tion that the order entered by the probate judge had de-
clared the decedent's domicile to be in England, proceeded
to say

"Supposing he had done so, and supposing that he was wrong, and the
fact was that the testator had not been really domiciled in England, but had
been domiciled in . . New York . . . could it possibly have been said
that the court of New York . . . would have respected the decision of the
judge ordinary . . . ? I cannot think so."

It is to be noted that the effect of the decision is that a finding of domicile in a probate proceeding is not binding even on the next of kin who are parties to the proceeding, for the reason that a finding of domicile is not necessary to the probate of a will; and it would seem that in the probate of Mrs. Hungerford's will, Chief Justice Russel, of the Supreme Court of Georgia in his dissenting opinion, *Hungerford v. Spalding*, 183 *Ga.* 547, 189 *S. E.* 2, was of like opinion, for he expressed the view that the question whether the testatrix was a resident of or domiciled in Fulton County was wholly irrelevant upon the only question which should have been submitted upon the probate of a will, namely, the *factum* of the will, *devisavit vel non.*

In *Thormann v. Frame, supra,* and in *Overby v. Gordon, supra,* the party in interest before the court was not a party to the probate proceedings and judgments which were sought to be invoked as having conclusively determined the question of the decedent's domicile, as was the fact in *De-Mora v. Concha, supra;* and, as the language of the court is to be taken with reference to the facts before it, we do not assume to say that the Supreme Court of this country has held that a finding of domicile in a probate proceeding is not binding even on the next of kin who was a party to the proceeding. That court in the cases cited, was not, nor are we here, called upon to consider the operation of a judgment in a probate proceeding in one jurisdiction as an estoppel against one who, although a party to that proceeding, undertakes, in a proceeding in another jurisdiction affecting the same decedent's estate, to raise again the question of the decedent's domicile.

It is sufficient to say that the Georgia judgment as a judgment *in rem,* binds only the property within the control of the court which rendered it, and the property in controversy here is not within its control; and as a judgment *in personam,* it cannot bind the appellant, for it was neither a party to that judgment, nor was it in privity with a party.

In *Baker v. Baker & Eccles & Co., supra,* in speaking of the argument *ab inconvenienti* pressed by the plaintiff in error, the court said that unless all possible distributees can be brought within the jurisdiction of a single court having authority to pass on the subject matter either by service of process or by voluntary appearance, it must be in many cases impossible to have a single controlling decision on the question of the domicile of a decedent. The appellees, laying especial emphasis on the word, "distributees," contend that if all possible distributees, that is, all persons interested in the succession, are brought before one court of competent jurisdiction by service of process or appearance, the whole world is bound on the question of domicile as decided by that court, even though the true domicile was elsewhere. In the case cited, the parties chiefly interested were distributees. The language of the court was directed to the facts. We think the court held no more than this, that one not a party to a judgment nor in privity with a party is not bound by it.

At one point in their briefs, the statement is made that the appellant and Mr. Hungerford are, in substance, the same on a question involving the succession. This is an oblique way of saying that, in the eye of the law, they are in privity. If that is what is meant, it is not the law. *Coca Cola Co. v. Pepsi-Cola Co.,* 6 *W. W. Harr.* 124, 172 *A.* 260; *Forbes v. Douglass,* 175 *Mass.* 191, 55 *N. E.* 847. The fact that the temporary administrator in New York was appointed on the petition of Mr. Hungerford is of no consequence. At another point in the briefs it is said that it is immaterial that there is not privity between the heirs-at-law and the personal representative of the estate, for the reason that lack of privity exists only to the extent of the interest of creditors. This is obscure.

Again the appellees characterize the appellant as the representative of a mere creditor or tax claimant; and, it is said, that as such creditor or claimant is not entitled to be

heard on the succession or probate of a will in the first instance, the appellant here cannot, after the succession has been determined, put the succession in issue. The appellant, however, is far more than being the representative of a mere creditor or tax claimant. Any claim that the State of New York may have for inheritance taxes or other taxes is not the basis of its right to be heard on the question of domicile. That right proceeds from the fact that the decedent was its domiciled citizen at the time of her death; and the appellant, appointed by the authority of its proper court, is its arm to gather together, in so far as is permitted by law, the personal property of the deceased, and to administer and distribute the property according to her will and the laws of the state. Being the seat of domiciliary administration, it is not compelled to press its claim for taxes in a jurisdiction of ancillary administration.

The argument that the judgment probating the will and qualifying the executors drew to the court of ordinary, against all the world, the sole and exclusive possession of the personal property of the testatrix, except where some local administration for the benefit of creditors may be required, is logically unsound. It is an example of what the logicians term a *petitio principii*. The assertion is true only in the case of domiciliary administration. The very matter to be proved is implicitly taken for granted.

And finally, whatever power and authority the executors may have over the estate by the will of the testatrix, it does not follow that they can ignore the authority and the laws of the state of true domicile; nor is another state in which personal property of the decedent may be found or have its *situs* required by any theory of title or constructive possession in the executors to repudiate the domiciliary state.

The contention that effect should be given to the Georgia judgment on the principles of comity necessarily falls as a

result of our finding that the decedent, at the time of her death, was domiciled in New York.

The decree of the court below is reversed with the direction that it enter a decree requiring Coca-Cola International Corporation to issue a certificate or certificates for the shares of stock of the corporation owned by Julia M. Hungerford, at the time of her death, to the appellant.

RICHARDS, J., dissenting.

RODNEY, J., by reason of illness, took no part in the decision.