## IN RE GORDON'S WILL

1. WILLS—EVIDENCE HELD NOT TO SHOW MENTAL INCAPACITY OR UNDUE INFLUENCE, OR REQUIRE SENDING OF ISSUE TO JURY.

On appeal from register in a proceeding·to probate a will, naming as chief beneficiaries two nurses of the testatrix, who though strangers in blood, were close friends, to the exclusion of nephews, evidence *held* not to justify the direction of an issue for trial by jury, but to show that testatrix was of sound mind and not subject to undue influence.

2. WILLS—BENEFICIARY'S PARTICIPATION IN PREPARATION DOES NOT INVALIDATE WILL, IF THE FREE ACT OF THE TESTATOR.

While the law looks with suspicion on a will the preparation and execution of which has been attended to by a beneficiary, such a will is not invalid, unless the circumstances convince the court or jury that it was the act of the beneficiary, and not the free and conscious act of the testatrix.

3. WILLS—PREPARATION BY ATTENDING PHYSICIAN NAMED AS EXECUTOR DOES NOT INVALIDATE.

While a physician in daily attendance on a patient critically ill sustains a confidential relation, and must take no undue advantage of the patient, such relationship alone does not invalidate a will prepared by him or at his direction, naming the physician as executor, where it is not satisfactorily shown that he substituted his will for that of the testatrix.

4. WILLS—DIRECTING ISSUE TO JURY IS WITHIN COURT'S DISCRETION, AND NOT TO BE DONE IF PROPER DECISION IS CLEAR.

While, on appeal from the register of wills in a proceeding to probate an alleged will, the court has power to direct an issue to be tried by jury for its assistance and information, it is entirely within the court's discretion, and should not be done, if it is clear from the testimony what the decision should be.

5. WILLS—ALLOWANCE OF COUNSEL FEES TO CONTESTANTS PROPER, WHEN THEY HAD GROUND FOR CONTESTING PROBATE.

Where parties contesting the probate of a will had some ground for resisting it, an allowance of counsel fees was proper.

(*November* 22, 1920)

PENNEWILL, C. J., CONRAD and HEISEL, J. J., sitting.

*James H. Hughes* and *William R. Russel* (of the Maryland Bar) for propounders of the will, appellants.

*John B. Hutton* and *W. Watson Harrington* for caveators, appellees.

Superior Court for Kent County, October Term, 1920.

Appeal from the Register of Wills for Kent County.

Appeal by Joseph R. Smith, executor, and others, devisees, from the decree of the register of wills for Kent county, refusing to admit to probate the will of Mary R. Gordon, deceased. Decree reversed, and record remanded for correction and probate of the will.

The caveat of Daniel C. Crew, T. Benjamin Crew, Robert S. Crew, and Howell C. Crew, being heirs at law of said deceased, was received by the register against the allowance of an instrument as the will of said deceased, before its proof, alleging that said paper writing is not in fact the last will and testament of said deceased.

In due course the cause came on for hearing before the register who refused to admit the will to probate. An appeal from his decision was taken by Joseph R. Smith, executor, and Violet Crew and Mabel R. Mitchell, devisees, propounders of the will, to the Superior Court for Kent county. Citations were issued for each of the caveators, and also for Philip Crew, James Shephard, Carey Shephard, Jr., and Warren Crew, the remaining heirs at law of the deceased. Appearances were entered for the caveators, and there was a return of non est inventus as to each of the four remaining heirs at law of the deceased. As to the latter alias citations issued returnable to the next term of court, when again there was a return on each of non est inventus. Notwithstanding the court was requested to direct an issue to be tried by jury, the cause was tried by the court upon the record and depositions of the witnesses examined and taken at large in writing before the register.

The causes set up against the allowance of the will, the reasons of the court for declining to direct an issue, the general character of the testimony contained in the depositions of the witnesses before the register, and the contentions of counsel for and against the validity of the will, appear in the opinion of the court.

PENNEWILL, C. J. (delivering the opinion of the court). This cause is before the court on appeal from the register of wills for this county in the matter of the probate of the alleged last will and testament of Mary R. Gordon, deceased. The causes of appeal urged at the argument and relied upon by the appellants were that

the register erred in refusing to admit said will to probate on the ground that the testatrix when she executed the same was not of sound and disposing mind and memory, and also because she was subject to undue influence.

The caveators have requested the court to direct an issue to be tried by a jury to ascertain whether the paper writing in question is or is not the will of Mrs. Gordon. They ask this, not as a matter of right, but for the assistance and information of the court.

[1]   The evidence upon which the caveators rely, excluding that given by two nephews, consists entirely of the testimony of four witnesses, who swore that Mrs. Gordon was mentally incapable of making a will, and two of whom saw Mrs. Gordon on Monday, Friday and Sunday next preceding her death, on the 29th of December last. They were neighbors and called to see if there was anything they could do. Another witness saw her on Christmas day, and had called for the purpose of collecting a bill. He found her so weak that he thought she was not able to attend to business, but he had no conversation with her, did not ask her a question, and admitted that when about to leave Mrs. Gordon said:

"You have come a long ways and had better take your horse and put it in the stable and feed it."

Another witness saw Mrs. Gordon on Friday before her death on Monday, having called to get some geese that he had engaged. He was told that Mrs. Gordon was sick, and did not see her, but some one told her the business of the witness and he heard her say, "He's got the geese." His wife had called for them once before.

The two witnesses who called to see if there was anything they could do were in Mrs. Gordon's room on each of their three visits from a half hour to an hour, and about all they heard her say was:

"That old doctor just gives me tar pills. That old doctor is coming out here every day. I was in a great way last night. I told that old doctor he had to give me something to quiet my nerves."

One of these witnesses testified that on Friday Mrs. Gordon seemed so bad he did not remember her saying anything; she

turned yellow that day. This witness admitted that Mrs. Gordon seemed to be a little better on Sunday, the day before she died, and told the witness the grape juice she sent her was good. The husband of this witness thought on Sunday Mrs. Gordon "had been doped, had been given something to put more life in her; she seemed restless." He said he had no faith in Dr. Smith, the attending physician. Mrs. Gordon's nephews were notified by Mrs. Violet Crew of their aunt's illness and two of them came to her home, one three or four days before she died and the other the day before. So far as the testimony shows they had full access to their aunt's room, and liberty to talk with her at all times during their stay, except when she was attending to the execution of her will, when all persons were excluded but the doctor and the attesting witnesses. The nephews testified that their aunt was as bad as she could be, just living, that was all, and incapable of making a will. They said, after Dr. Smith and the attesting witnesses left her room, one of them asked her if she knew what she had done, and she answered, "No." Nothing was said about her having made her will.

It is unnecessary to review at length the testimony of the two nurses who were witnesses for the propounders of the will. Dr. Smith, the principal witness in the case, had never attended Mrs. Gordon before her last illness, and so far as the testimony shows had never previously known her or her nephews or the two nurses who were the chief beneficiaries in her will.

According to all the witnesses Mrs. Gordon was a very sick woman, and critically ill for ten days before her death. She was suffering from pneumonia and her condition grew worse from the time her sickness began till the end. Undoubtedly she was physically very weak, being in bed all the time and wholly unable to wait upon herself. Towards the last she had to be raised and held up when she took her medicine. When well she talked very little, and during her sickness scarcely at all.

One of the nurses, Miss Mabel Mitchell, had lived with and taken care of Mrs. Gordon and her business for three years before she died, and the other, Mrs. Violet Crew, the widow of Mrs.

Gordon's favorite nephew, had also been with her, assisting in nursing her for a week before her death.

These two nurses and Dr. Smith, who were with Mrs. Gordon during her illness more than any other persons, and much more capable of observing and knowing her mental condition than any others, testified that although physically very weak, her mind was absolutely normal, and she was mentally alert when she made her will and up to two hours before she died. The will was made about twelve or thirteen hours before her death.

Dr. Smith testified that on the morning of the day before Mrs. Gordon died he advised her if she had any business she wanted to have attended to that she had better have it attended to. "I hope you are not going to die and don't expect you to. It is my custom to advise my patients to have their business affairs attended to while there is time. Her mental condition was as clear then as it was the day I first saw her." He said she had become jaundiced and her heart was weaker, but her mind was alert until a very short time before she died.

To his suggestion about attending to any business, she responded that she wanted to make her will and that her taxes had not been paid. The doctor then said to her, if she wanted to make a will, if she would give him a synopsis of it, he would make a note of it, and have it drawn according to her direction; he asked her how she wanted it. She said she "had been intending to do that for a long while, but had neglected and put it off."

She said she wanted to leave the boys (meaning her nephews) $10 apiece; at that juncture Miss Mitchell suggested that she leave them $100. "The conversation was absolutely between me and Mrs. Gordon personally; nobody was consulted." After having made the bequests to the boys, as she called them, she said, 'after her bills were paid, she wanted the residue equally divided, between Mrs. Violet Crew and Miss Mitchell. "I asked her who she wanted to have the provisions of her will carried out; who she wanted to attend to it. She said, 'I would like you to.' I then wanted to know the names of the boys she referred to. I asked Miss Mitchell to write it down on a piece of paper, and when she

had done so I read them off in Mrs. Gordon's presence, and she signified her satisfaction by nodding her head."

The doctor further testified that he had the will prepared and took it to Mrs. Gordon's. "I saw Mr. Edward Dailey and Mr. Harvey Milbourn and asked them if they would come over there and witness her signature. In a very few minutes they came." The doctor said he first asked Mr. Dailey and requested him to suggest another witness. He named Mr. Milbourn. Apparently they were both well acquainted with Mrs. Gordon.

"When they came in I asked those who were present to retire to the other room; that I had some business that I was attending to for Mrs. Gordon." And I said before them, "As a matter of fact, it is her will that I have written and I want to read it to her." "I read the will to Mrs. Gordon in the presence of both of the witnesses. When I finished reading it I asked Mrs. Gordon if that was just as she wanted it. She said, 'Yes, just as I wanted it.' She said that she had been intending to have it attended to a good long while, and then she said: 'I am glad it is over with.' I asked her if she was able to sign her will and she said she was. With my assistance she raised up in bed and took the pen in her hands, and I saw that she was quite nervous, and I was afraid that it might not be intelligible if she made the signature. I suggested to her that she make her mark. I wrote her name and she made her mark herself in the presence of the two witnesses. I asked her at the time if that was her last will and testament and she said it was. Her mental condition, at the very time of the execution, was as clear and alert as it was at any time I ever saw her in my life. From the fact that she made the comments that she did, there shouldn't be any doubt in any person's mind."

The attesting witnesses corroborated the doctor as to all that he testified was done or said while they were in the room, and both of them testified that Mrs. Gordon was at the time capable of making a will.

We have attempted to state briefly, but accurately and sufficiently, the testimony of the witnesses on both sides, not dwel-

ling on that given by witnesses interested in either setting up or setting aside the alleged will.

We do not think Dr. Smith can be considered a witness pecuniarily interested in establishing Mrs. Gordon's will. He receives nothing under the terms of the will, and in no event will he receive more than the commissions allowed him as executor for administering the will which disposes of an estate amounting to only a few thousand dollars.

[2] Neither do we think there is anything in the testimony to show that Dr. Smith unduly influenced the testatrix in making her will. It is true that the law looks with suspicion upon a will the preparation and execution of which has been attended to by a beneficiary, but such a will is not invalid unless the circumstances are of such a suspicious character as to convince the court or jury that the alleged will was the act of the meddlesome beneficiary and not the free and conscious act of the testatrix.

[3] It is also true that a physician in daily attendance upon a patient critically ill sustains a relation to the patient that is confidential and sometimes controlling, and the law is jealous to see that no undue advantage is taken of such relation; but such relationship alone is not sufficient to invalidate the will. It must be satisfactorily shown that the relation and opportunity were used by the physician to substitute his will for that of the testatrix.

Nothing like that is shown in this case. Indeed the facts, and all reasonable inferences that can be drawn from them, rebut such belief. If Dr. Smith had such power over Mrs. Gordon as the caveators claim, and was disposed to use it for his own benefit, he could easily have made himself the principal beneficiary under the will, instead of the executor to administer it.

There is nothing in the testimony to convince us that Dr. Smith sought to influence Mrs. Gordon in giving her estate to her nurses rather than to her nephews. So far as we know he never knew either the nurses or the nephews until a few days before Mrs. Gordon's death, and it is not likely that he would have acquired in so short a time such an interest in the beneficiaries as to induce him to unduly influence his patient in the making of her will.

The claim that Mrs. Gordon was unduly influenced by the nurses, who are her chief beneficiaries, must be based upon the thought that it is unnatural and improbable that Mrs. Gordon should disregard her nephews, and give almost her entire estate to strangers. But we must not lose sight of the fact that while the nurses were strangers in blood to the testatrix they were not strangers in fact, or that while the nephews were not strangers in blood they probably were almost strangers in fact. It appears that until the last illness of Mrs. Gordon her nephews had scarcely seen her for at least three years, paid her but little attention, and they lived not far from her home. It further appears that when Mrs. Gordon visited Betterton, the place where her nephews lived, she stayed at the home of her favorite nephew who was the husband of Mrs. Crew, one of the beneficiaries in her will, and received but little attention from her other nephews while she remained in the place. And after her favorite nephew died she visited his widow, who apparently became the recipient of the affection that Mrs. Gordon previously felt for her husband. This woman went to Mrs. Gordon when she heard of her illness, assisted Miss Mitchell in caring for her, and several days before she died notified the nephews of their aunt's illness. And this was several days before the will was made.

There is nothing to indicate that Miss Mitchell unduly influenced Mrs. Gordon in making her will, or that she made any effort to do so for her own interest. It is clear from the testimony that Mrs. Crew and Miss Mitchell were kinder and closer to Mrs. Gordon than any others and they were probably the subjects of her love and affection as well as the objects of her bounty.

Such we think is a fair statement of the material testimony in the case, and the reasonable inferences to be drawn therefrom. And it will be observed that none of the witnesses ever heard Mrs. Gordon make an irrational remark.

When the witnesses for the caveators said Mrs. Gordon was incapable of making a will they must have based their opinions more upon her physical weakness, sickness, and failure to talk than upon any indications of an unsound mind evidenced by any-

thing she said or did. No witness has mentioned an act or word that indicates she did not know what she wanted, and what she was doing when she made her will, except the nephews who swore that after Dr. Smith and attesting witnesses had gone she was asked if she knew what she had done and answered, "No."

[4] Such being our view of the testimony we think the court would not be justified in directing an issue to be tried by a jury to ascertain whether the paper writing in question is or is not Mrs. Gordon's will. While the court have the power to direct such an issue for their own assistance and information, it is entirely within their discretion, and should not be done if it is clear from the testimony what their decision should be.

The estate involved is very small, the expenses already incurred are large, and another trial by a jury would cause much delay and consume in costs a considerable part of the estate.

Adopting the language used by one of the judges in the *Cummins Will Case*, 1 *Marv.* 423, 31 *Atl.* 816, we say:

"This court has no difficulty in reaching a satisfactory conclusion in this case, without the trial of the issue sought by the appellants, and the needless and therefore unjustifiable delay and expense thereof."

We are inclined to believe the principal reason for the request that an issue be framed to be tried by a jury was the desire to get in evidence certain testimony discovered since the trial before the register. That testimony, as we understand, is this: When the testamentary witnesses met, and were about to start to Mrs. Gordon's home to witness her will, Dr. Smith said, "I will go on ahead and get the d— s—— of b——s out of the way," meaning the nephews. Counsel for the caveators insist that such testimony is very material, and would be given by one of the testamentary witnesses if permitted to testify. And they further insist that even though an issue is not sent to the jury the court should permit them to supplement the record by introducing such testimony. Without deciding whether any testimony outside the record could or could not be introduced in a trial by the court, we are clearly of the opinion that if the testimony mentioned were shown it could not change the opinion the court has already reached. Mani-

festly it could have no possible bearing on the question of Mrs. Gordon's testamentary capacity, and very little, if any, upon the question of undue influence. Standing alone it could have no effect at all because it would show at most only a feeling or prejudice on the part of Dr. Smith against the nephews of the testatrix. We feel very clear that there is no other testimony which, if taken in connection with that now sought to be introduced, would convince the court that Mrs. Gordon was unduly influenced by Dr. Smith in making her will.

The law in this state is so well settled respecting the making of wills we think it unnecessary to refer to any cases. Under the facts in the case, and the law applicable thereto, it would not be possible to reach any other conclusion than the one we have stated. The court must be governed by the preponderance of the evidence, and that clearly proves that Mary R. Gordon at the time she executed her alleged last will and testament, was of sound and disposing mind and memory, and not subject to undue influence. Therefore, the decree of the register of wills refusing to admit said will to probate should be reversed by this court.

And now, to wit, this 22d day of November, 1920, it is ordered by the court that the decree of the register be reversed, and that the record in this case be remanded to him for the correction of his decree, and the probate of the will of Mary R. Gordon, in conformity with the foregoing opinion.

After the foregoing order was made, counsel for the appellees stated to the court that the register had made an allowance of $300 to cover expenses for counsel fees on each side, and asked the court to confirm such allowance.

PENNEWILL, C. J. [5] The court think the contestants in the present case had some ground for resisting the will, and certainly were justified in resisting the case on appeal after the register of wills had refused to probate the will.

The register having allowed as expenses for counsel fees $300 on each side, his allowance in that regard, as well as in respect to the payment of the costs, is affirmed.