ALBERT B. KAHN and HOWARD L. WILLIAMS,
Plaintiffs,

*vs.*

GENERAL DEVELOPMENT CORPORATION, a corporation of the State of Maryland, et al.,
Defendants.

*Supreme Court, On Appeal, October 2, 1961.*

---

*George T. Coulson,* of Marris, Nichols, Arsht & Tunnell, Wilmington, for Bellanca Corp., *George N. Craig,* of Craig, Summers & O'Hara, Washington, D. C., of counsel.

*Daniel L. Herrmann,* of Herrmann & Duffy, Wilmington, for defendants-appellees, Theodore Charnas, Hyman Jacobs and Stephen Charnas, New York City, of Counsel.

Southerland, C.J., and Wolcott and Bramhall,* JJ., sitting.

Wolcott, Justice: This is an appeal from a judgment of the Chancellor dated October 21, 1960 abrogating the effect of an agreement under which shares of General Development Corporation (hereafter General) and shares of Bellanca Aircraft Corporation (hereafter Bellanca) were deposited in escrow for ultimate exchange.

The suit arose by the filing of an action of interpleader by the escrow agents who held both the General stock and the Bellanca stock subject to the terms of the escrow agreement, hereafter more fully noted. The parties interpleaded and divided into two controverting sides, each claiming the General stock held by the escrow agents. Bellanca represents one side to the controversy and is the appellant, while certain of the depositing stockholders of the General stock represent the other side and are the appellees.

General was organized in 1946 but, by 1956, had fallen into financial difficulty and was in critical need of working capital. Various means of raising working capital were explored but ultimately, in June, 1956, pursuant to a proposal of Bellanca, an escrow agreement was entered into between the two corporations. The escrow agreement gave Bellanca the right to exchange 4000 shares of its stock deposited with the escrow agents for all of the outstanding stock of General deposited with the escrow agents by General's stock-

---

* By stipulation of counsel, this cause was decided by two of the members of the Court. By reason of illness, Justice Bramhall, who sat at the argument and in a preliminary conference, was prevented from participating in the final decision.

holders. The option of Bellanca to exchange its stock for General stock could be exercised by it at any time during a period of five years.

The escrow agreement gave Bellanca voting control of General; required it to furnish General with officers and directors for its management, and also required it to enter into an agreement with Equitable Security Trust Company (hereafter Equitable) to pledge sufficient collateral with Equitable to establish a line of credit for General in the amount of $150,000 to be used by General as working capital.

The deposit of the General stock with the escrow agents was approved by General's stockholders at a special meeting called by a notice sent to stockholders outlining the proposal made by Bellanca to General. The actual deposit of General's stock in escrow was made by means of a stock deposit letter from each stockholder, *inter alia,* establishing the conditions that if the Bellanca proposal did not become operative, or if Bellanca defaulted in its obligations under the escrow agreement, the General stock so deposited would be returned to the depositing stockholder.

The notice to General stockholders outlining the proposal of Bellanca to General, which presumably led to the approval of General's stockholders, was that Bellanca would loan General sufficient shares of Automatic Washer Company stock to be used by General to negotiate a loan of $150,000.

On the same day Bellanca and General entered into the escrow agreement, pursuant to its requirement Bellanca entered into a collateral loan agreement with Equitable which established a revolving line of credit to General of $150,000, provided Bellanca kept on deposit with Equitable at all times collateral with a market value of at least 200% of the balance of the current amount loaned by Equitable to General.

We note that the escrow agreement between Bellanca and General did not put into effect the proposal outlined to General's stockholders since Bellanca, rather than General, contracted with Equi-

table for the establishment of the line of credit. No point, however, is made of this departure from the original proposal and all parties seemed to have accepted it. We so assume from the fact that the appellees, the depositing stockholders, later charged Bellanca not with a departure from its original proposal, but with a breach of specific provisions of the escrow agreement entered into with General.

Meanwhile, pursuant to its obligation under the escrow agreement, General delivered to Bellanca the resignation of all of its officers and directors, and the escrow agents thereupon elected seven directors upon the nomination of Bellanca. Four of such directors were employees of Bellanca and three of such directors were employees of General. From the new directors so elected, Blythe of Bellanca was elected president; Shaw and Deppert of General were elected vice president and vice president and secretary respectively, and Baldini of Bellanca was elected treasurer.

Bellanca thereupon deposited with Equitable sufficient Automatic Washer Company stock to open a revolving line of credit for General of $150,000. Equitable thereafter, from June 5, 1956 to September 11, 1956, loaned a total of $70,000 to General. In October, 1956, for various reasons, the Automatic Washer Company stock became unacceptable as collateral to Equitable and it sold sufficient shares to realize $50,000 which was credited against General's loan. Bellanca thereupon paid Equitable $20,000 to liquidate the balance of General's loan and received back the unsold shares of Automatic Washer Company stock. Thereafter, while the loan agreement between Bellanca and Equitable remained uncancelled, Bellanca never deposited further collateral with Equitable to permit further borrowings by General under the loan agreement. It is probable that no further collateral was deposited under the loan agreement because of Bellanca's own financial difficulties.

On October 17, 1956, it was reported to General's board that Equitable would not accept any longer Automatic Washer Company stock as collateral, and that, accordingly, from then on, Bellanca would advance money to General direct. In November and Decem-

ber, 1956, Bellanca advanced to General in installments an aggregate of $20,000. Thereafter, commencing in January, 1957, Bellanca advanced no further funds to General.

Throughout this period, from the fall of 1956 through 1957, Bellanca's representative on the board of General, Baldini, controlled the finances of General. Through all of this period, Baldini was secretary of Bellanca which paid his salary, as well as treasurer of General, and, as such, in control of its financial affairs.

From January of 1957 on General was in constant need of working capital. In fact, its cash position at all times seems to have been critical. To finance its operations, because of the refusal or failure of Bellanca to advance funds, General was forced to borrow on the so-called V-loan against 100% of its receivables and 100% of its work in progress. When the limit of V-loan borrowings was reached General thereafter had no income since 100% of its receivables was paid against the V-loan borrowings.

General's borrowings from the V-loan were interest bearing although, under the escrow agreement between Bellanca and General, General had delivered to Bellanca a non-interest bearing demand note for $150,000 against which Bellanca ultimately had advanced $90,000 as further security for the payment of which General had executed a mortgage in Bellanca's favor in that amount.

It is apparent that in October, 1956, Bellanca then in control of General through its nominees, modified the escrow agreement between Bellanca and General by providing for the direct advancement of funds from it to General. The chancellor found as a fact that the depositing stockholders of General never agreed to this modification of the escrow agreement, and that in any event Bellanca through Baldini finally refused to make any further advances of funds to General, presumably because of Bellanca's own financial difficulties after January of 1957.

Admittedly, Bellanca's representatives on General's board managed that company profitably. The Chancellor found as a fact, however, that General's operations, while profitable, were nevertheless

damaged as a result of inadequate working capital, and the necessity of negotiating interest bearing V-loans despite Bellanca's agreement to supply interest free operating funds.

In the light of these circumstances, certain of General's depositing stockholders in the fall of 1957 instructed the escrow agents not to deliver their General stock to Bellanca if it attempted to exercise its option because of an asserted breach by Bellanca of the escrow agreement. This breach was alleged to be the refusal by Bellanca to continue to support the line of credit established with Equitable for General's benefit and, also, for the failure of Bellanca to supply General with proper management.

On March 2, 1959, by letter to the escrow agents, Bellanca purported to exercise its option to exchange its stock for that of General, and demanded delivery to it of the General stock deposited with the escrow agents. Thereupon, the escrow agents filed this interpleader action and Bellanca and the depositing General stockholders were ordered to interplead among themselves. After trial, the Chancellor in effect ordered the return to the objecting General stockholders of the General stock deposited, and established conditions to protect Bellanca's claim against General for the funds advanced by it to General. From this order, Bellanca appeals.

We turn first to the question of whether or not Bellanca breached its agreement with General. The escrow agreement required Bellanca to enter into an agreement with Equitable under which Bellanca would deposit sufficient collateral to support a line of credit for General in the amount of $150,000. Borrowings against this line of credit were to be used by General as working capital. In return, General was to deliver management and control of itself to Bellanca.

Pursuant thereto, Bellanca entered into an agreement with Equitable as a result of which Equitable extended to General a revolving line of credit in the amount of $150,000 supported by Bellanca's deposit with Equitable of collateral with a market value of at least 200% of the balance owed by General.

It is at least arguable that the loan agreement between Equitable and Bellanca was not in accord with the escrow agreement between Bellanca and General since one possible view of the escrow agreement would have required Bellanca to bind itself to the immediate establishment of a full credit of $150,000, while the actual loan agreement seems to have provided for a maximum up to which General could have borrowed from time to time upon the deposit of additional collateral by Bellanca. In any event, however, it does seem clear that at the outset Bellanca deposited with Equitable sufficient collateral to establish immediately a $150,000 credit in General's favor.

Thereafter, Equitable loaned General a total of $70,000 at which point the deposited collateral's market value had fallen below the required amount, and had also become unacceptable to Equitable for reasons not pertinent to this appeal. Bellanca, accordingly, caused General's indebtedness to Equitable to be liquidated, and informed General as heretofore related that, thereafter, it, Bellanca, would advance money to General directly rather than continue to support the line of credit with Equitable. In point of fact, in the fall of 1956, Bellanca did advance to General an additional $20,000. It seems clear that Baldini was in sole control of the financial affairs of General and could and did decide against further requests on behalf of General to Bellanca for further funds. It also seems clear that this action was taken by Baldini because of Bellanca's own financial difficulties.

The record does not show an agreement between General's depositing stockholders to this new arrangement and departure from the scheme of the escrow agreement. No such consent from the General stockholders having been obtained, we think it clear that as to them Bellanca must be held to have breached its obligation to maintain a line of non-interest bearing credit for General. One of the express conditions of deposit of the General stock was that the stock would be returned if Bellanca breached the escrow agreement, and the party imposing such a condition is entitled to its enforcement. 5 *Williston on Contracts, (Rev. Ed.)* § 1455; *Sheehan v. Hepburn,* 37 *Del.Ch.* 90, 138 *A.2d* 810; *Johnson Forge Co. v. Leonard & Co.,* 3 *Pennewill* 342, 51 *A.* 305, 57 *L.R.A.* 225; *Josloff v. Falbourn,* 2 *W.W.Harr.* 433, 32 *Del.* 433, 125 *A.* 349.

Bellanca argues, however, that even if it be assumed that the failure by it to maintain the line of credit was a breach of the escrow agreement, it was at most a technical breach and no injury resulted to General or its stockholders because Bellanca undertook to supply General's cash needs by direct advances. Assuming, however, that the breach of the escrow agreement by Bellanca, in the absence of injury to General and General's stockholders, was not, of itself, such a breach of the agreement as to warrant the enforcement of the conditions under which General's stock had been deposited, still that assumption does not help Bellanca's cause.

The Chancellor found as a fact that following the modification of the escrow agreement by Bellanca, General was consistently in need of funds for working capital which need was as consistently rejected by Bellanca which, through Baldini, was in control of General's finances. He found the fact to be that Bellanca's refusal to supply further funds to General worked an injury to General. This conclusion finds support in the record, and we must, accordingly, accept the fact as found by the Chancellor. *Thomas v. King, et al.,* 34 *Del.Ch.* 160, 99 *A.2d* 778.

We think it clear, therefore, that the altered commitment of Bellanca unilaterally imposed on General was not, as it turned out, the equivalent of that which Bellanca had undertaken by the escrow agreement. Consequently, its breach of the escrow agreement cannot be said to have been cured since the breach, not being cured by an equivalent, caused actual injury to General. This injury came from the deprivation of adequate working funds needed in current operations, and from the necessity of negotiating interest bearing loans which permitted only a hand-to-mouth, day-by-day existence, although Bellanca originally had undertaken to supply General with needed working capital interest free.

Next, Bellanca argues that its exercise on March 2, 1959 of the option to exchange its own shares for those of General deposited in escrow operated to divest the depositing stockholders of their interest in the General shares and limited their rights to the delivery to them of the Bellanca shares deposited for the exchange. The argument is that, assuming prior to the exercise of the option

Bellanca had been guilty of a breach of contract, still the exercise by it of its option was a condition subsequently terminating Bellanca's duty to answer to anyone for its breach of the escrow agreement.

To state the argument is to expose its fallibility. Its obvious difficulty is that by the escrow agreement Bellanca had only an option, which is a continuing offer made irrevocable for a fixed period when given for present consideration. 1 *Williston on Contracts, (Third Ed.)* §§ 61b, 61c. The consideration supplied by Bellanca to make the option irrevocable for a fixed period was its promise to establish and maintain a line of credit for General with Equitable. The failure of Bellanca to fulfill this obligation thus amounted to a failure of consideration and destroyed the irrevocability of the option. The depositing stockholders were thus free to revoke their offer, it no longer being made irrevocable by present consideration. This, they did, and there was, therefore, on March 2, 1959 no outstanding option to be exercised by Bellanca. Its exercise of a non-existent option was, therefore, a nullity.

Bellanca cites in support of this argument *Restatement of Contracts,* § 396, and 3*A Corbin on Contracts,* § 743, but these texts refer to situations totally unlike the one at bar, such as the sale of a chattel upon immediate payment of the purchase price with the right in the buyer to return the chattel within a specified time if it proves to be unsatisfactory. The buyer's failure to pay on delivery would be a breach of contract but the return of the chattel by him within the specified time would amount to a condition subsequent excusing the breach.

Bellanca then argues that the stockholders' action in demanding the non-delivery of their General stock to Bellanca was not timely and that, accordingly, they must be held to have waived whatever right to do so they once possessed. The burden of the argument is that the stockholders never notified Bellanca or General of their intention, but notified only the escrow agents. Bellanca cites 33 *C.J.S. Exchange of Property* §§ 10(b) and 10(c) to the effect that one seeking to rescind a contract for the wrong or default of the other party must act reasonably promptly to show his election to rescind.

The cited text, we think, has no pertinency. The action taken by these stockholders was not an election to rescind a contract but a demand that a condition of the contract, itself, inserted for their protection be enforced. Notice of this demand was given to the proper parties, the escrow agents, who held the shares in question, one of whom had been appointed by Bellanca and the other of whom had been appointed by General. Furthermore, the escrow agreement, itself, recites the fact both Bellanca and General agree that the escrow agents shall hold the deposited stock and "deliver or return the same as hereinafter provided." Under the circumstances, there was no duty or necessity to notify Bellanca directly, and the notices to the escrow agents having been sent October 3, 1957 and December 2, 1957, a reasonable time after the discovery of Bellanca's breach of the escrow agreement, were timely.

Finally, Bellanca argues that a provision of the final order restraining it from taking any action to enforce collection of the $90,000 owed it by General was not only unwarranted but beyond the authority of the Chancellor since this indebtedness was not a litigated issue of the cause.

However, the Chancellor may, in his discretion, require the performance of conditions designed to protect temporarily the rights of the parties pending the grant of final relief. This, we think, the Chancellor did since, obviously, time was required to permit an orderly transfer of the management of General from the hands of Bellanca to a board to be newly elected. There is no indication that General's indebtedness to Bellanca was questioned. Indeed, it seems to have been specifically recognized. We think we could not hold that the Chancellor abused his discretion in providing sufficient time to permit the orderly arrangement of the affairs of General by postponing for a short period of time the harassment of execution process for the collection of Bellanca's claim.

The judgment below is affirmed.