DANIEL F. NARDO, WILLIAM V. NARDO, WILLIAM J. NARDO and NICOLA NARDO, a minor, by his father and natural guardian, FLORE A. NARDO, Contestants Below, Appellants, v. JOSEPHINE C. NARDO, Proponent Below, Appellee.

(*April* 20, 1965)

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

*James P. D'Angelo* and *Stanley T. Czajkowski,* and *Paul R. Connolly,* of Hogan & Hartson, Washington, D. C., for contestants below, appellants.

*Thomas H. Wingate,* for proponent below, appellee.

Supreme Court of the State of Delaware, No. 77, 1964

HERMANN, Justice:

This is a will contest case which requires us to determine the scope of review (1) by the Orphans' Court on an appeal from the Register's Court and (2) by the Supreme Court on a further appeal from the Orphans' Court.

Viewed in the light most favorable to the contestants below, appellants, the relevant facts are these:

Anna Maria Nardo died on November 11, 1961 leaving a will dated January 6, 1960. The will was admitted to probate by the Register of Wills of New Castle County. Under that will, the testatrix left her entire estate outright, except for a $1,000. bequest, to Josephine C. Nardo, a niece of her husband. A petition for review was filed in the Register's Court under 12 *Del. C.* Sec. 1310 by certain nephews of Anna's husband, alleging that the will resulted from undue influence exerted by Josephine and her brother, Frank Nardo. After hearing on the petition for review, without opinion or findings of fact, the Register revoked the grant of letters testamentary on the ground that the will was the product of such undue influence. Josephine appealed to the Orphans' Court under Del. Const. Art. 4, Sec. 31, *Del. C.* Ann[1]. On the appeal, the matter was heard on the record, as provided by Orphans' Court Rule 178(d), *Del. C.* Ann.[2] The Orphans'

---

[1]Del. Const. Art. 4, Sec. 31 provides: "Section 31. The Registers of Wills of the several counties shall respectively hold the Register's Court in each County. Upon the litigation of a cause the depositions of the witnesses examined shall be taken at large in writing and made part of the proceedings in the cause. This court may issue process throughout the State. Appeals may be taken from a Register's Court to the Orphans' Court. In cases where a Register of Wills is interested in questions concerning the probate of wills, the granting of letters of administration, or executors' or administrators' accounts, the cognizance thereof shall belong to the Orphans' Court."

[2]Orphans' Court Rule 178(d) (1) provides: "(1) Record on Appeal or on Exceptions. Appeals or exceptions shall be heard on the original papers and exhibits which shall constitute the record on appeal or on exceptions."

Court concluded that the contestants had failed to prove undue influence. It reversed the Register's Court and remanded the cause with instructions to dismiss the petition for review and to readmit the will to probate. The contestants appeal under Del. Const. Art. 4, Sec. 11(5).

Anna was about 65 years old when she died. She was foreign born and had difficulty with the English language. She and her husband conducted a retail liquor business and, for about 22 years before Anna's death, Josephine lived with them. She assisted in the operation of the business and received compensation therefor. Anna's husband was blind and Anna could neither read nor write. Anna's husband died in the latter part of 1958. There were no children of the marriage and Anna's family consisted principally of nieces and nephews and their children.

In April 1959, Anna had executed a trust agreement and a different will. These documents were prepared by an attorney to whom she was taken by certain nieces and nephews shortly after her husband's death. Under these instruments, after specific bequests to children of nephews totaling $24,000., a life interest was created for Josephine and, upon her death, the trust was to terminate and the corpus divided between nephews William V. Nardo and Frank Nardo and their heirs. When these documents were executed, because Anna had difficulty with the English language, the attorney called in an Italian-speaking member of the Bar who explained the papers to Anna. She executed both instruments by her mark.

Josephine learned of the testamentary plan under the 1959 will. She was very unhappy about the arrangements made thereby and so stated to Anna on many occasions. Josephine insisted that the 1959 testamentary plan was a breach of the expressed promises and wishes of Anna's husband and, in effect, was a breach of faith with him. Josephine was persistent and nagged Anna on the subject during the remainder of the year 1959.

Josephine occupied a very close relationship with Anna after the death of the latter's husband. They shared the same bedroom and

Josephine was Anna's closest confidant. During this period, Josephine assumed a greater part of the management of the business. Anna was deeply grieved by the loss of her husband and dreamed of him frequently. On several occasions, Josephine and her sharing in the estate also figured in the dreams.

In January 1960, Anna was hospitalized for a jaundice condition and diagnostic surgery was prescribed. A day or two before the operation, the will here in contest, together with a revocation of the trust agreement, were executed in the hospital. These instruments were prepared by another attorney, now the attorney for the proponent herein, whose secretary was a friend of Anna. Anna's physician was called in to certify to her competency. While the new will was being executed, the attorney and his secretary were present. One of the contestants was barred from the hospital room but Josephine and her brother remained. The secretary's husband, a police detective, was also present.

The subsequent surgery disclosed an irremediable cancer condition. After her release from the hospital, Anna lived with Josephine and Frank in a new home purchased by Anna. Other relatives were discouraged from communicating with her; telephone calls were monitored and either Josephine or Frank was present during visits. When Anna returned to the hospital during her terminal illness, Josephine or Frank remained at her bedside and other relatives were barred.

The disposition of this appeal requires the resolution of (1) the contestants' contentions as to the propriety of the type of review accorded the case by the Orphans' Court; (2) the question of the scope of review to be exercised by this court in this type of appeal; and (3) the contestants' contentions that the Orphans' Court misconceived the law as stated in *Conner v. Brown*, 9 W.W. Harr. 529, 3 A.2d 64 (1938), the last major pronouncement in this State on the subject of undue influence, and misapplied the law to the facts of this case.

*The Scope of Review in the Orphans' Court*

The Orphans' Court conceived its appellate function in this case to be a determination of "whether or not there is evidence upon which the order of the Register of Wills could reasonably be based," concluding that if "the record meets this test, the order of the Register of Wills must be affirmed."

The contestants argue that the Orphans' Court failed to conform to the rule it stated to be governing in that it analyzed, weighed, and re-evaluated the evidence heard by the Register and drew its own inferences therefrom. It is contended by the contestants that, in effect, the Orphans' Court made new findings as though its function was to hold a trial *de novo* rather than to test the record for the existence of any evidence to support the Register's decision. The contestants' argument amounts to the proposition that the criteria of a review by the Orphans' Court on appeal from the Register's Court are the same as those employed in the review of a jury case by this court. Compare Del. Const. Art. 4, Sec. 11(1) (a).

It appears that the Orphans' Court mistated the nature and scope of review it undertakes in an appeal from the Register's Court. The source of its error becomes manifest in its citation of In re Delaware Sports Service, Storey, 196 A.2d 215 (1963), which was an appeal from the State Public Service Commission to the Superior Court; and *Hartley v. Creed,* Del., 196 A. 2d 224 (1963) and *Turner v. Vineyard,* 7 Terry 138, 80 A.2d 177 (1952), which were appeals to this Court from the Superior Court in non-jury cases.

We must look to a different line of cases for a determination of the proper function of the Orphans' Court in an appeal from the Register's Court. Such appeals were heard by the Superior Court prior to the constitutional Amendment of 1951 reorganizing the State courts. See 48 Del. Laws, Chapter 109. Presently, Del. Const. Art 4, Sec. 31 provides: "Appeals may be taken from a Register's Court to the Orphans' Court." Until 1951, the predecessor of Sec. 31 was Del. Const. Art. 4, Sec. 33 which provided: "Appeals may be taken from a Register's Court to the Superior Court, whose decision shall be final." The evolution of Sec. 31 makes it clear, we think, that it was the

legislative intent to transfer to the Orphans' Court the precise appellate jurisdiction theretofore exercised by the Superior Court excepting, of course, the omitted finality of decision and the provision for further appeal to this court.

The probate system, then composed of the Register's Court as the court of first instance and the Superior Court on appeal therefrom, originated in our Constitution of 1792, Art. VI, Sec. 17 of which provided: "Appeals may be made from a register's court to the supreme court, whose decision shall be final." The language of that Constitution was carried forward into the Constitution of 1831 (Art. VI, Sec. 22) except for the substitution of the Superior Court on the appeal for the earlier Supreme Court whose jurisdiction and powers were merged in the former. The Constitution of 1897 (Art. 4, Sec. 33) contained substantially the same provision until the Amendment of 1951 · substituted the Orphans' Court for the Superior Court on the appeal.

What, then, was the scope of review as exercised by the Superior Court prior to 1951 on appeals from the Register's Court?

In *Cummins, et al. v. Cummins, et al.,* 1 Marvel 423, 439–440, 31 A. 816, 819 (1895), there was disagreement on the question. Chief Justice Lore was of the opinion that the cause was not to be heard *de novo* on appeal from the Register and that the Superior Court did not have the power to refer an issue to a jury, saying, however, that "* * * in appeals from the register our courts have quite uniformly decided both the law and fact, without reference to a jury;" and that "* * * in contested cases, the register of wills hears all the evidence, takes the same at large in writing, and primarily determines all questions at issue. His decision is final, unless an appeal is taken. Such an appeal lies to this court, where the case is again heard and finally determined. * * *." Grubb, J., went further (1Marvel 438, et seq., 31 A. 819), however, and concluded that, under the established law and practice of the State, the cause was removed from the Register's Court upon appeal to the Superior Court and was there to be tried *de novo,* either with or without the aid of a jury at the discretion of the court. Cullen, J., concurred in the decision to affirm the decree of the

Register's Court but expressed no opinion on the matter in controversy.

Apparently, the view of Judge Grubb prevailed during ensuing years. In subsequent cases, the Superior Court seemed to assume that its appellate function included trial *de novo* on the record with the aid of a jury to advise and assist the court and enlighten its "conscience" if the court felt the need for such help.

For example, in the case of *In re Gordon's Will*, 1 W.W. Harr. 108, 111 A. 610 (1920), we find the Superior Court reversing the Register's Court after reviewing, analyzing and weighing the evidence presented in the Register's Court in an undue influence case; and stating in the appeal "tried by the court upon the record" made before the Register: "Under the facts in the case, and the law applicable thereto, it would not be possible to reach any other conclusion than the one we have stated. The court (Superior Court) must be governed by the preponderance of the evidence * * *." In Gordon, the court adopted the language and views of Judge Grubb in Cummins and stated:

"Such being our view of the testimony we think the court would not be justified in directing an issue to be tried by a jury to ascertain whether the paper writing in question is or is not Mrs. Gordon's will. While the court have the power to direct such an issue for their own assistance and information, it is entirely within their discretion, and should not be done if it is clear from the testimony what their decision should be."

Similarly, In *re Sharpley's Will*, 2 W.W. Harr. 154, 120 A. 586 (1923), in an appeal from the Register's Court in which the mental capacity of the testator was under scrutiny, the Superior Court reviewed and analyzed the evidence at length, weighed and evaluated it, and found it sufficient to support the Register's decision; stating as its opinion from "the testimony in the case" that the testator was of sound and disposing mind and memory. Here again, the Superior Court concluded that, such being its view of the testimony, it would not be justified in directing an issue to be tried by a jury, which it had the discretion to do, but which should not be done "if it is clear from the

testimony" what the decision should be. The duty and function of the Superior Court to make an independent judgment on the evidence before it was further manifested in the Sharpley case by the court's statement that it "should not evade the performance of a clear duty and responsibility by imposing the same on a jury."

By the time of In re *Ainscow's Purported Will,* 2 Terry 148, 17 A.2d 227 (1940), it seemed settled that the hearing on an appeal from the Register to the Superior Court amounted to a trial *de novo,* with the court's power to direct an issue to a jury in such retrial to be beyond question.

The fullness of the review conducted by the Superior Court in recent years is well demonstrated in *Conner v. Brown,* supra. There, the Superior Court reviewed the evidence before the Register in minute detail, discussed at length the testimony of apparently every witness, weighed and evaluated the evidence, and concluded:

"All of the facts and circumstances have been considered carefully in the light of well understood principles of law applicable in such cases. There is no acceptable evidence of influence unduly exercised upon the testatrix by the beneficiary; and the conclusion is compelled that the instrument offered for probate expressed her free and unrestrained mind and will, and that the Register of Wills properly accepted it as such."

We think it clear, therefore, that prior to the 1951 constitutional Amendment, the Superior Court did not limit its review to a search for evidence to support the Register's decision. It is apparent that, on such appeals, it was the established practice for the Superior Court to retry the case on both law and fact, with or without the assistance of a jury.

We hold that the scope of review in the Orphans' Court on appeal from the Register's Court is the same as that which existed in, and was exercised by, the Superior Court, prior to the 1951 Amendment. The Orphans' Court is equipped to exercise that appellate jurisdiction fully in view of the statutory power of the Orphans' Court

to direct an issue of fact to a Superior Court jury. See 10 *Del. C.* Sec. 731.

In the instant case, the Orphans' Court did indeed, as the contestants complain, go further than the *Turner v. Vineyard* type of review when it weighed and evaluated the evidence, drew inferences and conclusions, and found that "considered in the light of the record as a whole" the evidence did not "provide a basis upon which a trier of fact could reasonably conclude * * * that the will in question resulted from undue influence." The Orphans' Court found the testimony of certain witnesses to be "indirect, uncertain and argumentative;" it did more than search the record for any evidence to support the Register's finding; but it acted properly in so doing. As we have seen, the Orphans' Court had the authority and the duty to weigh and evaluate the evidence as it did. Accordingly, we conclude that the contestants' contentions in this regard are without merit.

## The Scope of Review in the Supreme Court

Having determined that the appeal in the Orphans' Court is a rehearing on the fact and law, we must decide how far this court goes in reviewing the action of the Orphans' Court in a case of this kind. There is a paucity of decisions in this field because, as we have seen, there was no appeal from the Superior Court in such cases prior to the 1951 Amendment; and appeals from the Orphans' Court in other types of cases were to the Superior Court, the decision in which was also final. See State ex rel *Walker v. Harrington,* 3 Terry 14, 27 A.2d 67 (1942).

The jurisdiction of this court in appeals from the Orphans' Court was established in 1951 by Del. Const. Art. 4, Sec. 11 (5).[3] The jurisdictional language is identical to Del. Const. Art. 4 Sec. 11 (4) which creates the jurisdiction of this court on appeals from the Court of Chancery; and it is substantially the same as the ancient

---

[3]Del. Const. Art. 4, Sec. 11 (5) provides: "(5) To receive appeals from the Orphans' Court and to determine finally all matters of appeal in the interlocutory or final decrees and judgments and other proceedings in the Orphans' Court."

constitutional language covering appellate jurisdiction in Chancery matters. See 1831 Del. Const. Art. VI, Sec. 7; 1792 Del. Const. Art. VII, Sec. 1. Moreover, although the Orphans' Court lacks general equitable jurisdiction, in exercising the jurisdiction conferred upon it by Del. Const. Art. 4, Sec. 10 and Sec. 31 and implementing statutes such as 10 *Del. C.* Secs. 731 et seq., the Orphans' Court has such incidental equitable powers as may be necessary and proper to determine fully matters lawfully before it. See *First Nat. Bank of Frankford v. Andrews,* 26 Del. Ch. 344, 28 A.2d 676 (1942).

We conclude that the scope of our review in appeals from the Orphans' Court is the same as in appeals from the Court of Chancery. A restatement of our jurisdiction in equity appeals, as we see it, may be helpful.

██ ██ While this court is confined to the record in considering the evidence in an appeal from the Court of Chancery, an equity case on appeal is before us for rehearing on both fact and law. Sitting in appeal from Chancery, this court has the duty to review the evidence and to make its own findings of fact, if necessary, even though our findings may be in addition to, or contrary to, those made by the Chancery Court. It is our function in a Chancery appeal to examine the facts and the law and to reach our own conclusions with respect thereto. *Sohland v. Baker,* 15 Del. Ch. 431, 141 A. 277, 283, 58 A.L.R. 693 (1927). As Justice Wolcott stated in *duPont v. duPont,* 34 Del. Ch. 267, 103 A.2d 234, 243 (1954):

"* * * The only limitations upon our authority in this respect are those which our sense of judicial propriety and discretion and the exigencies of the cause may dictate. We are under no compulsion to act, but we may act if we think it proper."

A distinction is made between cases in which the Chancery Court sees and hears the witnesses and cases in which it does not.

██ Where the evidence was not heard by the Chancery Court, but was considered on depositions, report of a master or appraiser, or

on other documents, it is the duty of this court to review the evidence and to draw its own conclusions with respect to the facts and the law. *Sohland v. Baker,* supra; *New York Trust Co. v. Riley,* 24 Del. Ch. 354, 16 A.2d 772, 783 (1940).

Where, however, the evidence was heard by the Chancery Court, this court ordinarily will not disturb a finding of fact if it appears from the record that there was sufficient evidence to support it. The reason is that the trial court, having seen and heard the witnesses, is deemed better able to determine the credibility and the weight to be given their testimony. But this is not to say that this court is bound to, or will automatically, approve and accept a finding of fact because made after hearing oral testimony and supported by some evidence. The judicial propriety and discretion above mentioned will ordinarily result in approval; but in every equity appeal this court, in the performance of its duty, must weigh the evidence for its sufficiency to support the finding. In *Blish v. Thompson Automatic Arms Corp.,* 30 Del. Ch. 538, 64 A.2d 581, 604 (1948) this court stated that "if there be sufficient oral testimony in the record to support the findings of fact below, such findings should not be disturbed by this Court." In *Bertrand v. Hill,* Del. Ch., 173 A.2d 615 (1961) this court examined the record for "sufficient evidence" to support the finding of the Chancery Court; and in *Hartley v. Creed,* Del., 196 A.2d 224 (1963) this court sought and found "substantial" evidence to support the finding of fact of the Superior Court in a non-jury case.[4] We recognize that in *Kahn v. General Development Corporation,* 40 Del. Ch. 83, 91, 174 A.2d 307 (1961) the sufficiency of the evidence to support the fact found by the Chancery Court was not specifically mentioned as a requisite of approval; but the citation therein of *Thomas v. King,* 34 Del. 160, 99

[4]It is noteworthy that a 1960 constitutional Amendment abolished the distinction between writs of error and appeals and, by Del. Const. Art. 4, Sec. 11 (1), adapted to appeals in Superior Court non-jury civil cases substantially the same appellate jurisdictional language as appears in Del. Const. Art. 4, Sec. 4 governing Chancery appeals. Accordingly, there no longer seems to be any basis for distinction between our scope of review in Superior Court non-jury civil cases and in Chancery appeals. By reason of the 1960 Amendment, *Turner v. Vineyard,* 7 Terry 138, 80 A.2d 177, which was before this court in 1952 on a writ of error, no longer represents the current status of the law as to this court's scope of review in a Superior Court non-jury civil case.

A.2d 778 (1953), where an "abundance" of supporting evidence was found, demonstrates that the language used in the Kahn case was not intended to be inconsistent with the conclusions stated herein.

A distinction is also made between a finding of fact and an inference drawn from the facts. We are obliged to draw our own inferences in all Chancery appeals. Where a finding is a deduction, a process of reasoning or logical inference, it is the duty of this court to review the inferences made below, to draw its own inferences, and to reach its own conclusions in connection therewith. *New York Trust Company v. Riley,* supra.

In the instant case, the Orphans' Court did not see and hear the witnesses and the findings and conclusions of both the Register and the Orphans' Court rest, in large measure, upon inference. Accordingly, equating the scope of review on appeal from the Orphans' Court to that on appeal from the Court of Chancery, we find that our function in the instant case is to review the entire record and to draw our own inferences and conclusions as to the facts and the law.

*The Law and the Facts*

Accordingly, we have examined the entire record of the cause as made before the Register and we have considered the facts of the case in the light of the applicable principles of law.

The criteria for a finding of undue influence were well stated by Chief Justice Layton speaking for the Superior Court in *Conner v. Brown,* supra, as follows:

"* * * Undue influence, as the adjective suggests, is an excessive or inordinate influence considering the circumstances of the particular case; and the general rule is that the degree of influence to be exerted over the mind of the testator, in order to be regarded as undue, must be such as to subjugate his mind to the will of another, to overcome his free agency and independent volition, and to impel him to

make a will that speaks the mind of another and not his own. It is immaterial how this is done, whether by solicitation, importunity, flattery, putting in fear, or in some other manner; but whatever the means employed, the undue influence must have been in operation upon the mind of the deceased at the time of the execution of the will. The essentials of undue influence are a susceptible testator, opportunity to exert influence, a disposition so to do for an improper purpose, the actual exertion of such influence, and the result demonstrating its effect."

We approve the rule as thus stated.

In the case at hand, since all other major testimony came from interested or at least biased persons, we find most significant the testimony of the attendant physician. He testified that he had been the family doctor to Anna and her husband for about 16 years; that he had seen her with increasing regularity during that period, both at home and at his office, until his visits reached 2 or 3 per week from 1959 on; that over the years the testatrix spoke often of her indebtedness and gratitude to Josephine and always praised her. The physician testified that he hospitalized the testatrix in January 1960; that he was called to the hospital room on January 6, 1960 and was asked by the attorney who prepared the 1960 will, in the presence of others, whether the testatrix had testamentary capacity; that his answer was that she was mentally well and capable of making her own decisions; and that she was not under sedation at the time. The physician further testified that, on that occasion he was told that a new will had just been explained to her; that the testatrix voluntarily referred to the fact that Josephine had worked for her and with her, that "she was deserving of everything that she was giving her," and that "Josephine had done a lot for her and she deserved what she was giving her under the Will." The doctor further testified that when the testatrix was hospitalized in her terminal illness, he gave orders to post a "No Visitors" sign and to bar all visitors except "real close blood relations," meaning Josephine and Mr. and Mrs. Frank Nardo with whom the testatrix was living; and that during

this period the testatrix "kept calling for Josephine to stay and stick by her all the time." The physician testified that to the best of his knowledge, based upon seeing the testatrix professionally over the years, there were no efforts made upon the testatrix "to coerce or make her bend her will."

Other evidence in the case supports the facts as stated at the outset hereof in the light most favorable to the contestants. Nevertheless, we are of the opinion that the contestants failed to sustain their burden of proving, by a preponderance of the evidence, that the will in question resulted from undue influence. The evidence does not meet the prescribed tests: It falls far short of showing a susceptible testatrix, a disposition on the part of Josephine to exert influence for an improper purpose, or a will demonstrating on its face the effect of undue influence upon the testatrix. Under all of the facts and circumstances of the case, we think it more reasonable to conclude, as the Orphans' Court did, that the testatrix, of her own free will, merely fulfilled her ultimate wish to favor by her testamentary plan the most natural recipient of her bounty.

The judgment of the Orphans' Court is affirmed.